FILED
December 01, 2024
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: Belinda Gamez
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS (EL PASO)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | Case No.: 3:24-CR-01931-LS-1 |
| Plaintiff, | . | El Paso, Texas |
| vs. | . | |
| JORGE LUIS SANTANA RIOS, | . | |
| Defendant. | . | Monday, November 25, 2024 |
| . . . . . . . . . . . . . . . | . | 1:11 P.M. |

TRANSCRIPT OF HEARING ON MOTION TO SUPPRESS
BEFORE THE HONORABLE ANNE T. BERTON
UNITED STATES MAGISTRATE COURT JUDGE

APPEARANCES CONTINUED ON NEXT PAGE.

Deputy Clerk: Myrna Gallegos
United States District Court
525 Magoffin Avenue, Suite 105
El Paso, Texas 79901

Transcription Service: Liberty Transcripts
9107 Topridge Drive
Austin, Texas 78750
(847) 848-4907
DBPATEL1180@GMAIL.COM
www.libertytranscripts.com

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

For the Government: United States Attorney's Office
BY: ADAM R. HINES, ESQUIRE
700 East San Antonio Avenue,
Suite 200
El Paso, Texas 79901
(915) 534-6884
adam.hines@usdoj.gov

For the Defendant: Office of the Federal Public Defender
BY: ELYSE M. BATALLER-SCHNEIDER, ESQUIRE
700 East San Antonio Avenue
Suite D-401
El Paso, Texas 79901
(915) 534-6525
elyse_bataller@fd.org

Office of the Federal Public Defender
BY: SANDRA S. LEWIS, ESQUIRE
700 East San Antonio Avenue
Suite D-401
El Paso, Texas 79901
(915) 534-6525
Sandra_Lewis@fd.org

For the Interpreter: E. Gallegos and T. McEneny

INDEX


| | Page |
|---|---|
| Case called | 4 |
| Arguments on Motion to Suppress | |
| By: Ms. Bataller | 194 |
| By: Mr. Hines | 200 |
| Court's Ruling on Motion to Suppress | 205 |
| End of Proceedings | 206 |
| Certification of Transcriber | 207 |

WITNESSES FOR THE GOVERNMENT:

| | |
|---|---|
| SABRINA GONZALEZ | |
| Direct Examination by Mr. Hines | 7 |
| Cross-Examination by Ms. Bataller | 84 |
| Redirect Examination by Mr. Hines | 113 |
| Recross-Examination by Ms. Bataller | 119 |
| Further Redirect Examination by Mr. Hines | 122 |
| Examination by the Court | 122 |
| Further Redirect Examination by Mr. Hines | 134 |
| Further Recross-Examination by Ms. Bataller | 136 |
| RYAN McKENZIE | |
| Direct Examination by Mr. Hines | 139 |
| Cross-Examination by Ms. Bataller | 182 |

WITNESSES FOR THE DEFENDANT:

(None.)

| | | Marked | Received |
|---|---|---|---|
| EXHIBITS FOR THE GOVERNMENT: | | | |
| 1 | Gonzalez Body-Worn Camera Footage | 15 | 17 |
| 2 | McKenzie Body-Worn Camera Footage | 148 | 148 |

EXHIBITS FOR THE DEFENDANT:

(None.)

**EL PASO, TEXAS, MONDAY, NOVEMBER 25, 2024, 1:11 P.M.**

THE CLERK: All rise. Magistrate Court is now in session.

THE COURT: Good afternoon. Please be seated.

The Court calls the case of the United States of America versus Jorge Luis Santana Rios in EP:24-CR-1931. This is for a motion to suppress hearing.

May I have announcements, please?

MR. HINES: Good afternoon, Your Honor. Adam Hines on behalf of the United States of America. As always, it is a pleasure to be here, ma'am. And the United States is ready.

THE COURT: Thank you.

MS. LEWIS: Good afternoon, Your Honor.

Sandra Lewis along with Elyse Bataller on behalf of Mr. Santana Rios. We are ready.

Your Honor, I guess before we get started, I do see witnesses in the courtroom, so I would just ask that the rule be invoked.

THE COURT: All right, thank you.

MS. LEWIS: And one last housekeeping matter, Your Honor. At some point, I think that we have to unplug some equipment here and re-plug it in with our equipment. And so we're just asking permission to be able to do that.

THE COURT: Of course. All right. So before we do

continue, I want to remind the parties that as required by Rule 5(f), as amended by the Due Process Protections Act, the United States is ordered to produce all exculpatory evidence to the Defendant pursuant to Brady v. Maryland and its progeny. Not doing so in a timely manner may result in sanctions including exclusion of evidence, adverse instructions, dismissal of charges, and contempt proceedings.

Now, as I said, we're here on the Defendant's motion to suppress. And my understanding is that there was no warrant here. So it is going to be the Government's burden to do that.

So, Mr. Hines, my understanding is that you will be going first? The Government will go first here?

MR. HINES: That's correct, Your Honor.

THE COURT: All right. So there's been a request for the rule to be invoked, and I will invoke the rule. So let me ask for the parties to bring all their witnesses up to the front.

MR. HINES: Your Honor, with the Court's permission, the United States would like to bring Sabrina Gonzalez of the El Paso Police Department and Ryan McKenzie of the El Paso Police Department.

THE COURT: All right. Ms. Lewis, any witnesses?

MS. BATALLER: Your Honor, we have no witnesses.

THE COURT: Oh, okay. Ms. Bataller, thank you.

All right. Good afternoon to you both. Will you please raise your right hands?

(Whereupon, the witnesses were sworn.)

THE COURT: All right. Thank you. You may lower your hands. Let me get your names, beginning with you, sir.

MR. MCKENZIE: Ryan Lewis McKenzie.

THE COURT: And you, ma'am?

MS. GONZALEZ: Sabrina Nicole Gonzalez.

THE COURT: All right. Now I want to instruct you that the rule has been invoked, meaning that once you exit this courtroom, you cannot re-enter the courtroom, all right, unless you've been instructed to do so by the Court or someone at the Court's direction. In addition, you cannot discuss your testimony with anyone else other than the lawyers in this case, nor can you allow anyone else to discuss their testimony or anyone else's testimony with you. A violation of the rule is punishable by contempt.

Do both of you understand?

MS. GONZALEZ: Yes, ma'am.

THE COURT: All right. So both of you, if you can please remain outside. Thank you.

All right. So just one moment, everyone.

(Whereupon, there was a brief pause in the proceedings.)

MR. HINES: That's fine, Your Honor.

(Whereupon, there was a brief pause in the proceedings.)

THE COURT: All right. Mr. Hines, go ahead and call your first witness.

MR. HINES: Yes, Your Honor. Permission to approach the podium?

THE COURT: Oh, yes, please. Thank you.

MR. HINES: Your Honor, with the Court's permission, the United States would like to call Officer Sabrina Gonzalez of the El Paso Police Department.

THE COURT: All right. You can have a seat, Officer Gonzalez. Okay? Thank you.

SABRINA GONZALEZ, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

THE COURT: Go ahead, Mr. Hines.

MR. HINES: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. HINES:

Q Officer Gonzalez, can you go ahead and state your full name and occupation once more for the purposes of the record, please?

A Sabrina Nicole Gonzalez. I work with the El Paso Police Department.

Q And we are recording this. So just if you need to move the mic to get it comfortable and close to your mouth, get in there and make sure you're able to clearly speak. Okay. How long have you been an officer with the El Paso Police Department?

A Coming up in January, I'll be hitting seven years.
Q Okay. And how are you currently employed with the El Paso Police Department?
A I work for the gang unit.
Q Okay. How long have you been a part of the gang unit?
A I'll be coming up to three years in February.
Q And prior to being on the gang unit, what did you do with the Police Department?
A I worked on the west side of town for patrol.
Q Okay. And what were your duties on patrol?
A If we had some downtime, we did traffic stops. But we went to call to call. We handled your barking dog call to your murders, to your drive-by shootings, to your motor vehicle accidents, your burglary of vehicles, burglary of habs, family violence cases, DWIs.
Q Okay. And you said you've done almost seven years, you'll have seven years in January?
A Yes, sir.
Q Okay. And in those seven years, how many traffic stops have you conducted?
A I would say more than a thousand, sir.
Q Okay. And the majority of those in the first half of your career when you're with the west side unit or when you're with the gang unit?
A I would say most with the gang unit, sir. But I've --

back in patrol, I did a lot of traffic stops as well, proactive policing.
Q Okay. Now you used the term proactive policing there. What does that mean?
A Pretty much preventing crimes. If I observed a traffic violation, then I would initiate a traffic stop or subject checks, welfare checks, cases like that.
Q Okay. And what's your current role with the gang unit?
A We handle anything gang related. So that could be from your graffiti cases to your drive-by shootings, your robberies, your discharge of firearms, anything that's gang related, sir.
Q Okay. And are you an investigator with the gang unit?
A No, sir.
Q What's your duties with the gang unit then?
A I'm a unit for policing, so we assist our investigators with takedowns, felony stops, surrounding call-outs. I'm in the uniformed side.
Q Okay. And as part of your duties as a uniformed police officer, do you do proactive patrolling here as well?
A Yes, sir.
Q Okay. And were you working in this capacity on --
MR. HINES: Give me one second, Your Honor.
BY MR. HINES:
Q Were you working in this capacity on August 7th of this

year?
A Yes, sir.
Q What shift in the day were you working?
A Day shift.
Q Okay. And what were you doing on that shift?
A We were working high crime areas. And that was going to be 1330 Lomaland area and Gateway West.
Q Okay. You say it's a high crime area. What does that mean?
A Well, we've had a kidnapping case around that area. We have manufacturing delivery cases. We have several unlawful carrying cases. We have prostitution. We have drive-by shootings.
Q Okay. Now, is this area known to you? Is it a specific residence? Is it a commercial establishment? What is that general vicinity?
A Hotel areas.
Q Okay. Are there multiple hotels in that area?
A Yes, sir.
Q Okay. And you just listed a litany of crimes. Are those things that you know to be occurring at that location through other people's training and experience, or have you experienced it?
MS. BATALLER: Objection. Calls for hearsay.
THE COURT: Re-ask your question, Mr. Hines.

MR. HINES: Do you have personal --
THE COURT: I'm going to overrule the --
MR. HINES: -- knowledge --
THE COURT: Hold on.
MR. HINES: Apologies.
THE COURT: I'm going to overrule the objection. Re-ask your question.
BY MR. HINES:
Q Yeah. Do you have personal knowledge as to what you just described, those crimes that you just described, or are you basing that off of general knowledge on the police force?
A Through my own experiences, sir.
Q Okay. When you say you're basing it on your own experiences, how long have you, again, been with the gang unit?
A Almost three years.
Q Okay. And has this area that you just described been a place that you patrolled those three years?
A Yes, sir.
Q How often in those three years have you patrolled this area?
A A lot, sir. I would say at least once a week.
Q Okay. So once a week for three years?
A Yes, sir.
Q Okay. What has been your personal experience with

crimes occurring in this area in the last three years when you're patrolling it once a week?

A We've assisted with weapon charges, drug charges, manufactured delivery. We assisted with the kidnapping case. We've had several of those arrests, wanted subjects. Subjects have evaded from us in that area, as well.

Q Okay. And in your training and experience, why is this area conducive to this sort of crime?

A It's a lot of violent crimes, sir. In that motel, you have a lot of people come in and out of those areas.

Q Okay. And this happened in August of this year, correct?

A Yes, sir.

Q Okay. And you testified that you were patrolling that day, right?

A Yes, sir.

Q Okay. Prior to August, had you seen an uptick in any sort of specific crimes in this area, let's say, in the three months prior?

A Yes, sir.

Q What type of crimes?

A The same ones, sir. So unlawful carrying, weapon charges, manufactured delivery, drug charges, wanted subjects, evading cases.

Q Okay. What do you -- in your training and your

experiences with this uptick, what do you attribute that to?

A People trying to commit criminal activities.

Q Okay. Let me ask this a different way then. In the three months leading up to this, so from about May of this year down to August, right, more or less, did you notice an uptick when you were patrolling, or did it kind of stay constant in the way that there was crime occurring in this general vicinity?

A It's constantly busy, sir.

Q Okay. Did you notice any other crimes particularly more at this point in time over the course of the summer than you had noticed, let's say, during the winter?

A Yes, sir.

Q What type of crime did you notice more?

A A lot of prostitutions, human smuggling. Summers are very busy for us, sir.

Q Okay. And you said human smuggling. Is that correct?

A Yes, sir.

Q And is that a state crime, or is that a federal crime?

A That's a state crime, sir.

Q What crime is that under the state?

A It's going to be Texas Penal Code, Chapter 20, I believe, sir, human smuggling.

Q Okay.

MS. BATALLER: Your Honor, I'm not sure the

relevance of this line of questioning.

MR. HINES: I'll get there, Your Honor.

THE COURT: Okay.

MR. HINES: I'm establishing a basis of the witness's knowledge to testify.

THE COURT: All right. The objection is overruled. Continue.

MR. HINES: Thank you, Your Honor.

BY MR. HINES:

Q Okay. So let's move forward. So on the date in question, are you patrolling by yourself?

A No, sir.

Q Did you have a partner with you?

A Yes, sir.

Q Did you have a dash camera?

A Yes, sir.

Q Was it operational?

A Not that day. No, sir.

Q How do you know it wasn't operational?

A Because of testing, sir.

Q Okay. And when did you test it, before or after you went on patrol?

A Before shift.

Q Okay. And what did you decide to do when you determined that the camera wasn't operational?

A I notified my supervisor working that day.
Q Okay. And what was the course of action that you ended up taking?
A We still took it out in the field because it was still an operating vehicle.
Q Okay. And what time of day were you working, you said?
A Day shift hours, yes, sir.
Q Okay. And what is day shift hours?
A Around 7 a.m. to 5 p.m.
Q Okay. And if this is at the end of the summer, is that entire period daylight?
A Yes, sir.
Q Okay. Were you wearing a body-worn camera at that time?
A Yes, sir.
Q Was it operational?
A Yes, sir.
Q And did you ensure that it was operational before you went on patrol?
A Yes, sir.
Q Okay. And did you employ it when you were on patrol?
A Yes, sir.
Q Have you previously reviewed what's been marked as United States or Government's Exhibit Number 1?
A What is that, sir?
Q Your body-worn camera, have you reviewed that?

A Yes, sir.
Q Okay. And the video that you reviewed that was Government's Exhibit Number 1, had it been altered in any way?
A No, sir.
Q Had it been changed in any way?
A No, sir.
Q And does it fairly and accurately depict what you saw and you perceived and you experienced during the course of your shift that day?
A Yes, sir.
Q Okay. And subsequent to your shift, how did you document what was in that camera?
A It downloads into our Axon Channel, yes, sir. We have an Axon that it goes on to.
Q Okay. And the video that you reviewed, is it the same as the video that went into the Axon?
A Yes, sir.
Q And again, has it been altered in any way?
A No, sir.
MR. HINES: Your Honor, at this point, I move to admit Government's Exhibit Number 1.
THE COURT: Any objection?
MS. BATALLER: No, Your Honor.
THE COURT: All right. Government's Exhibit Number

1 will be admitted.

(Whereupon, Government's Exhibit 1 was admitted into evidence.)

BY MR. HINES:

Q Okay. At what point does this video begin? Do you have a recollection?

A Around 2:25 p.m.

Q Okay. So that's in the early afternoon?

A Yes, sir.

Q Okay. Can you describe for the Court the events that led up to you deploying your camera? Let me rephrase that. Did you just -- is your camera continuously running?

A Not continuously. No, sir.

Q Okay.

A It's ready to go, but it's not continuously recording.

Q Okay. Under your agency's policies and procedures, what are the moments or decision points that are required in order to turn the camera on so it records?

A When we start initiating our lights and sirens inside the vehicle.

Q Okay. Can you describe to the Court what happened prior to you initiating your camera, when you turned on your lights and sirens on August --

MR. HINES: Sorry again, Your Honor. I should know this.

BY MR. HINES:
Q On August 7th of 2024?
A Yes, sir. On August 7th, my partner and I were working proactive policing in the area of 1300 Lomaland and 11100 Gateway West. I'm driving.
Q Hold on a second real quick. Is that that area that you described that's a high-traffic area?
A Yes, sir.
Q And what particularly -- based off of your training experience, what particularly were the crimes that were particularly prevalent within the last three months?
MS. BATALLER: Objection. Asked and answered.
THE COURT: Is there something else you're going to cover?
MR. HINES: As to her state of mind as she's driving that day. That's what I'm trying to get to.
THE COURT: As to her state of mind as to what she's --
MR. HINES: As she's in the car. So I'll rephrase the question.
THE COURT: Okay, rephrase it.
BY MR. HINES:
Q When you left on patrol that day and you're driving in that area, what are you looking for that day?
A Any crimes being committed.

Q Are there any particular crimes that you're concerned about that specific day?

A All of them, sir. Weapon charges, drug charges, anything. I'm trying to prevent any crime from occurring in my presence.

Q Okay. So you and your partner are on patrol in this area. What do you do next?

A I'm driving. I'm the driver that day. I'm driving northbound at the 1300 block of Lomaland. This is when I observe a vehicle facing westbound coming out of the private parking lot of the Motel 6 at 1330 Lomaland. I pass it up. I can't see who's driving or who's in the vehicle, but I pass it up. And I'm looking in my rearview mirror, and that's when I see the vehicle not making a decision to go northbound or southbound.

Q And what does that indicate to you in your experience with thousands of traffic stops and patrolling this area once a week for the past three years?

A I don't know if he doesn't want to get pulled over. I don't know if he's trying to prevent me from seeing him. I don't know if he's scared to get pulled over. But at this point, when I'm looking at my rearview mirror, that's when I see that there's no traffic. So he can make a decision to go northbound or southbound, and he's not.

Q Okay. Now, you said you've been patrolling this area at

least once a week for the last three years. So that's -- we're talking about 150 times you've driven through this area on patrol.
A Many times. Yes, sir.
Q Okay. How often do you see vehicles exiting that same location?
A A good amount of times, sir.
Q Like, are we talking hundreds?
A Yes, sir. I would say every time we work it, we're -- traffic stops all the time from that location.
Q Okay. And the vehicle you just described, did it act the way that every other vehicle you'd seen coming in and out of there acted?
A No, sir.
Q Was it different?
A Yes, sir.
Q And what ways was it different from what you'd seen previously?
A The amount of time it was taking for him to make that decision to go left or right, northbound or southbound.
Q And your training and experience in that particular area and looking through that area, what normally happens when you look in your rearview mirror?
A They go if there's no traffic. They make that decision to go left or right.

MS. BATALLER: Objection, Your Honor. She can't testify to what these people are deciding to do. She's not in their position to understand what they're thinking at the time. She's testifying from their perspective.

MR. HINES: Let me rephrase that.

THE COURT: First of all, I think the objection was late. So the objection is overruled. Re-ask the question.

BY MR. HINES:

Q So what do you normally see when you look in your rearview mirror and there's a vehicle in the same position as that vehicle that you just described?

A They go. They go left or right. They go northbound or southbound.

Q And how much time does that take?

A Whenever they have free traffic.

Q Okay.

A Whenever there's no traffic.

Q So it's almost an instantaneous reaction?

A Yes, sir.

Q Okay. And again, so what did you believe was occurring when you saw that this vehicle was not behaving as other vehicles did?

A They were hiding something.

Q Okay. So what did you do next?

THE COURT: Sorry, Agent. What did you say?

THE WITNESS: They were hiding something, ma'am.

THE COURT: Okay.

BY MR. HINES:

Q Okay. So what did you do next?

A At that time, I'm still observing the vehicle from my rearview mirror. And that's when I see the vehicle make an opposite direction from my -- I'm going northbound. He turns left. He turns southbound on the 1300 block of Lomaland.

Q Okay. And then what do you do?

A At that point in time, I do a U-turn, and I start driving southbound as well.

Q Why did you do that?

A I wanted to see who was in the vehicle.

Q Okay. What happened next?

A At that point in time, he immediately gets on the left mandatory turn lane and fails to signal turning left into the private property of the Valero gas station there at the corner of Lomaland and Gateway West.

Q Now, you're saying he. What exactly -- when you say he, what do you mean?

A Mr. Rios.

Q Okay. But at this time, you don't know he's the driver of the vehicle?

A No, sir.

Q Okay. So is it the vehicle then that you saw complete

that action?
A Yes, sir.
Q Okay. And is that when you begin to initiate your lights and sirens?
A Yes, sir.
Q And at the same time your lights and sirens initiate, do you physically turn on your body camera, or is it linked?
A It's linked. Yes, sir.
MR. HINES: Okay. And I'm going to play the video here. We're just going to kind of go through this as we go. Your Honor, permission to play and publish United States Exhibit Number 1?
THE COURT: Yes.
MR. HINES: I apologize.
(Whereupon, the video was played briefly on the record at 1:33 p.m.)
BY MR. HINES:
Q Okay. Now, what are we looking at here, just basically, and lay this out?
A That's -- I'm a driver right there. Those are my hands.
THE COURT: Mr. Hines, do you want us to --
MR. HINES: I'm going to expand it, Your Honor.
THE COURT: -- lower the lights a bit?
MR. HINES: I have a good view in my area. If you need a better view, Your Honor, you can lower the lights, or

if the witness needs a better view, or Defense.

THE COURT: Just lower the lights a little bit. That's better. Yes. Thank you.

BY MR. HINES:

Q Okay. Now, this is your vehicle?

A Yes, sir.

MR. HINES: Okay. And I'd like, for the purposes of the record, to note that the timestamp on United States Exhibit Number 1 in the top right-hand corner is what I'll reference throughout the video, and it is in 24-hour time. And the time at this point is 14:25:34.

(Whereupon, the video was played briefly on the record at 1:34 p.m.)

BY MR. HINES:

Q And what are you doing down here with your right hand?

A I'm initiating the vehicle's lights and sirens.

Q Okay. Now, why are you initiating the lights and sirens?

A Because I observed a traffic violation occur in my presence.

Q And what's the traffic violation that you observed?

A Failed to signal.

Q Okay. And describe the failed to signal to me.

A It's in the Texas Transportation Code. He failed to advise, you know, the person behind him or myself which way

he was going to go. And that's going to be in Texas Transportation Code 454.104.

Q Okay. And what was the vehicle's movement at that point? Was the vehicle -- when the vehicle was supposed to advise following drivers or oncoming drivers of which way it was going to go, what was it doing and what should it have done?

A It should have signaled left, but it did not signal left. The vehicle had no signal.

Q Okay. And when you say the vehicle had no signal, did you observe the left rear tail light area? Where are you looking for a signal?

A Yes, sir. The left rear of the vehicle, and it was not displaying the turn signal.

Q Okay. And did anybody stick an arm out to indicate that they were turning a direction --

A No, sir.

Q -- and use a hand signal?

A No, sir.

Q Is that something that you sometimes see or you've seen when you've been patrolling where someone's rear light wasn't working, that they would signal with their arms?

A Yes, sir.

Q And that did not happen this day?

A No, sir.

Q Okay. Where was the vehicle traveling to when it signaled the left-hand turn signal? Was it going into a business or a residence, or was it changing lanes within the road?
A It was changing lanes within the road.
Q Okay. And right here is where you said you're beginning to initiate the traffic stop, correct?
A Yes, sir.
(Whereupon, the video was played on the record at 1:36 p.m.)
BY MR. HINES:
Q So what's happening as you're driving here?
A At this point in time, the windows were rolled down. And at this point in time, I'm observing the vehicle coming to a stop, but the windows are now being rolled up.
Q Okay. And where was the vehicle coming to a stop to?
A On the north side of the Valero gas station.
Q Okay. And did the vehicle exit the roadway and enter the Valero gas station?
A Yes, sir.
Q And was it exiting the roadway to enter the gas station on its own volition, or in response to your lights and sirens?
A He did that himself, sir.
Q Okay. So the vehicle was continuing to turn left then

before you turned the lights and sirens on to enter the Valero, or did it enter the Valero because you turned on your lights and sirens?
A No, sir. He entered the Valero.
Q Right. Let me re-ask it so I can be more clear because I think I'm confusing you. Was the vehicle entering the Valero prior to you turning on your lights or sirens?
A Yes, sir.
Q Okay. So you hit the lights and sirens as you're coming up behind the vehicle?
A Yes, sir.
Q Okay. And you mentioned just now that the windows were rolled down?
A Yes, sir.
Q When did you first notice that the windows were rolled down?
A When they were coming to a stop.
Q Okay. And then you said that the windows began to be rolled up?
A Yes, sir.
Q Why did that concern you?
A I don't know what's inside the vehicle, sir.
Q Like, what are you -- okay. So what are you concerned about with that to where you've noticed it and marked it in your head?

A At that point in time, I'm scared he's going to shoot me. I'm scared that he's rolling up the windows for me to prevent -- to see whatever's inside that vehicle.

MR. HINES: Okay. Let's continue the video.

(Whereupon, the video was played briefly on the record at 1:38 p.m.)

BY MR. HINES:

Q Okay. What are you saying here?

A I'm telling him to roll down all the windows, lower all the windows.

Q Okay. And the vehicle that we see on the lower right-hand part of the screen that's labeled gangs, G18194, is that your patrol vehicle?

A Yes, sir.

Q Okay. Which of these vehicles, from left to right, the first one being a red truck, the last one being some sort of a sport utility crossover, and then there's one in the middle that looks like it's a Subaru, which of these three vehicles is the vehicle that you pulled over?

A It's going to be that one, that Subaru in the middle with the paper tags.

Q Okay. And what is the posture of its windows right now?

A Rolled up.

Q Okay. Does paper tags have any significance to you?

A Not if they're up-to-date. No, sir.

Q Okay. Could you tell at this point whether they're up-to-date or not?
A No, sir.
Q Okay. So is this the same vehicle that you said you saw pause leaving the high-traffic, high-crime area?
A Yes, sir.
Q Okay. And how far from that high-traffic, high-crime area are we right now in this parking lot?
A It's about two businesses back, so it's pretty close.
MR. HINES: Okay. Let's continue.
(Whereupon, the video was played briefly on the record at 1:40 p.m.)
BY MR. HINES:
Q What did you say just there? Do you know?
A I'm telling my partner, Officer Matthews, to be careful; he's not lowering the windows.
Q Why are you saying that?
A Because I've already asked him to lower all the windows, and at which point he's not.
Q Okay. And the person that we see on the right-hand side of the screen now, that's who?
A My officer -- Officer Matthews, my partner.
Q Okay. And is your concern at this point only that they're not responding to your commands?
A No, sir.

Q What is your concern?
A I'm scared at this point that they're not complying with my orders already.
Q Okay. And you testified that you've done thousands of traffic stops.
A Yes, sir.
Q Okay. At this point, is this, in your mind, a normal traffic stop?
A No, sir.
Q How is it different right now?
A Usually they lower all the windows and keep their hands where I can see them on top of the steering wheel.
Q Okay. So the time on your body camera reads 14:25:56, correct?
A Yes, sir.
Q So we are, like, ten seconds after you initiate your lights and your sirens?
A Yes, sir.
Q So at this point, do you -- I guess -- I have to think of how I want to say this. At this point, this does not seem like a normal traffic stop to you?
A No, sir.

MR. HINES: Okay. Continue.

(Whereupon, the video was played briefly on the record at 1:41 p.m.)

BY MR. HINES:
Q Okay. Now, what do we see here?
A I see the back left passenger stick his entire head out, and he's lighting a cigarette.
Q Okay. And how do you know that this person is lighting a cigarette?
A I'm sorry, he's smoking a cigarette.
Q How do you know that this person is smoking a cigarette?
A He's holding it with his right hand.
Q Okay. And had you been able to see this person when you made the stop prior?
A No, sir.
Q Okay. And you said you've been a police officer for how long?
A Almost seven years.
Q Okay. And you said you've done how many traffic stops?
A Thousands.
Q Okay. In your training and your experience in those thousands of traffic stops, or a thousand traffic stops, more or less, what is indicative to you of the windows being rolled up and a passenger smoking a cigarette?
A That he's nervous or that he's looking back to possibly see where I'm at so he could shoot me or tell the driver where I'm at.
Q Okay. And in your thousand traffic stops, how many

traffic stops involve narcotics investigations?
A Many.
Q When you say many, are we talking, like, five?
A No, sir.
Q Fifty?
A More.
Q A hundred?
A I would say more, sir.
Q Two hundred?
A Yes, sir.
Q Okay.
A If not more.
Q Okay. So somewhere probably between 200 and 300 of the thousand traffic stops you've done have turned into narcotics investigations?
A Yes, sir.
Q Okay. And your experiences with narcotics investigations, does this indicate anything to you?
A Yes, sir.
Q What does it indicate to you?
A He's trying to prevent me from smelling whatever's inside that vehicle.
Q What do you think he's trying to prevent you from smelling?
A Possible narcotics, marijuana.

Q Okay. And how do you know what marijuana smells like?
A Well, I've been trained for seven years. And when I worked at a patrol on the west side, we have a narcotics depository that we pass by every day. So we could smell the odor of marijuana every day.
Q Okay. And have you smelled the smell of other narcotics?
A Yes, sir.
Q Okay. And how have you smelled the smell of other narcotics?
A With previous arrests as well, sir.
Q Okay. Have you received training on the smell of narcotics?
A Yes, sir.
Q And is that, like, informal training or, like, what would be called like field training? Or is that like you went to a class or some sort of a formal course of instruction?
A Both, sir.
Q Through previous arrests, and then also throughout the academy we had several trainings with that as well. I've also taken drug interdiction classes where we were trained on the odors and stuff like that as well.
Q Okay. So in addition to your experience with narcotics investigations, do you have multiple training in vehicular

narcotics intervention?
A Yes, sir.
Q Okay. All right. Let's continue.
THE COURT: Mr. Hines, if you can please, when you stop, if you can mention the timestamps --
MR. HINES: Yes.
THE COURT: -- that will help us later on.
MR. HINES: Yes. And the timestamp right now, Your Honor, is 14:25:58, and that's where I paused it before I began my last line of questioning. So we're going to continue at this point.
(Whereupon, the video was played briefly on the record at 1:44 p.m.)
BY MR. HINES:
Q Okay. I've stopped the video again at 14:26:04. What is it that you've just said? And then I think at the risk of a compound question, part of it's in Spanish and then part of it's in English, correct?
A Yes, sir.
Q So what is it that you said?
A I'm telling him, lower all the windows, and I'm trying my best to say los ventanas, ventanas, like, lower all the windows in Spanish.
Q Okay. Did you mention something about hands at that point?

A Yes, sir.
Q What did you say?
A And show me your hands.
Q Why did you say that?
A Right now when I'm walking up to the passenger on the left side.
Q Uh-huh. Why did you say that?
A Oh, I need to make -- at this point, I don't know what he has in his hands. I don't know if he's going to pull anything out to hurt me. So I need to make sure that for my safety, for his safety, for my partner's safety, that I can see everybody's hands.
Q Okay. And the perspective that we're looking at of this body camera, is this -- where is this body camera worn on your body?
A It's on my chest.
Q Okay. And does it --
A On my vest.
Q Does it sit lower than your eye view?
A Yes, sir.
Q Okay. So do you have the ability to potentially see down and into the vehicle?
A Yes, sir.
Q Are you able to see into the vehicle at this point?
A Very little, sir.

MR. HINES: Okay. Let's continue.

(Whereupon, the video was played briefly on the record at 1:46 p.m.)

BY MR. HINES:

Q Okay. I've stopped it again at 17:46 and 10. What did we just see happen?

A I had to physically knock on the window for the driver, Mr. Rios, to lower his window.

Q Okay. And on your camera right now, we can see the driver of the vehicle, correct?

A Yes, sir.

Q And is the driver of the vehicle in the Courtroom today?

A Yes, sir.

Q Can you identify them by where they're sitting and an article of clothing that they're wearing?

A Yes, sir.

Q He's over here to my left wearing all red.

MR. HINES: Okay. And, Your Honor, I'd ask that the record would reflect that this witness has identified the Defendant in this case.

THE COURT: Ms. Bataller?

MS. BATALLER: No objection.

THE COURT: All right. Then the record will reflect that the Defendant in this case has been identified by the witness.

BY MR. HINES:
Q Okay. And what did you ask the Defendant to do?
A To lower his window.
Q And what did he say to you?
A That (In Spanish). So he doesn't understand anything of English.
Q Okay. So do you speak Spanish?
A Enough to get by. Yes, sir.
Q Okay. When you say enough to get by, what do you mean?
A I grew up with my grandma speaking nothing but Spanish to me. And I would try my best to talk Spanish to her, but it's a little broken. Both sets of grandparents are from Mexico, so they just speak Spanish.
Q Okay. And you said you've been a police officer for seven years, correct?
A Yes, sir.
Q Do you speak Spanish during your job?
A Yes, sir. I try my best.
Q Okay. How often when you're on patrol do you speak Spanish?
A Every day, sir.
Q Okay. And when you give commands to people in Spanish, are they generally responsive?
A Yes, sir.
Q And generally, if there is some sort of a communication

barrier, what do you do?
A I try my best. I use a lot of my hands, and then I'll advise them. Like, I can look at their face and I can tell whether they're understanding or not. And if not, I'll try my best to rephrase what I'm saying.
Q Okay. You said you look at someone's face. What are other markers or visual or physical things that you're looking for to understand whether or not someone is complying with you or has knowledge of what you're saying?
A If they're doing a nod yes, then I understand that they're understanding me. Or if they're, you know, raising their hands and looking at me like I don't know what you're saying, then I'll try my best to rephrase what I'm telling them so they understand.
Q Okay. And in addition to the narcotics training that we talked about with, like, your general experience of smelling different types of narcotics, have you gone through any sort of training that would teach you about people's body posture or how they respond to your questions?
A Can you repeat that, sir?
Q Have you gone through any sort of training that would teach you about how people respond to your questions while you're investigating something or their body posture or how they react?
A Yes, sir, through our drug and addiction courses.

Q Okay. And what are things that you're looking for when you're standing next to a vehicle like you are right now on how people respond to what you're saying?
A How they respond to my questions. If they're answering my questions, if they're trying to -- if they're not complying, if they're not, I guess, responding to what I'm saying.
Q Okay. And again, you said that you've done thousands of traffic stops. At this point, have we returned to what a normal traffic stop is?
A No, sir.
Q How is this different at this point at 14:26:10 than a normal traffic stop?
A At this point, I have the passenger that stuck out his window -- head out of the window, lighting the cigarette. The windows are being rolled up. The driver took a good amount of time to lower the window. I had to physically knock on his window for him to roll it down. Now my spidey senses are a little higher than normal.
Q Okay. You said your spidey senses are higher than normal. What do you mean by that?
A Now I'm getting nervous with what's going on inside that vehicle, if there's something going on.
Q Okay. At this point, not today, but at this point in the video, watching this video, has it helped you recall your

presence and state of mind at that point?
A Yes, sir.
Q What's your presence and state of mind at this point where I paused the video?
A There's something going on. There's something illegal going on right now.
Q Do you have any idea what it is? Do you think you know what it is at this point?
A At this point, I'm thinking yes, sir. I know it's either narcotics that's going on or human smuggling at this point.
Q Why do you think it's human smuggling?
A Because at this point, the back left passenger is looking at me like he's super confused. But also the language barrier, possible.

MR. HINES: Okay. We're going to continue the video, and we're going to continue from the 14:26:10 mark.

(Whereupon, the video was played briefly on the record at 1:51 p.m.)

BY MR. HINES:
Q Okay. So I paused it again at 14:26:15. What did you just say? What was the response? And then what's the passenger in the back doing?
A My partner asked the back left passenger to throw out his cigarette.

Q Why did that occur?
A Well, I don't want him to burn me with it.
Q Okay. And for the first time in the perspective of the camera, we can now see a passenger is riding in the front seat, correct?
A Yes, sir.
Q Okay. Had you noticed that person independent of the view of the camera yet?
A No, sir.

MR. HINES: Okay. Let's continue.

(Whereupon, the video was played briefly on the record at 1:51 p.m.)

MR. HINES: Okay. I paused it again at 14:26:22.

BY MR. HINES:

Q What is it that you just asked the occupants of the vehicle?
A If everybody could show me some sort of ID or documentation.
Q And why are you asking for an ID or documentation?
A At this point, I need to know everybody who's inside the vehicle.
Q And why do you need to know who's inside the vehicle?
A For our log sheet purposes, to see who I'm dealing with at this point in time.
Q Okay. And generally, in a normal traffic stop, do you

ask to see everyone's identifications?
A Yes, sir. I do.
Q Okay. If it's a family with a mom and a dad and three kids in the back, do you ask to see an ID card for the mom?
A Yes, sir. For the mom, yes, sir.
Q Okay. So do you ask to see ID cards for kids on a normal traffic stop?
A No, sir.
Q Okay. But here you ask to see everybody's stuff?
A Yes, sir.
Q Okay. Do you have any concerns? Again, back to your present state of mind, what are your concerns when you're asking for the papers or for the identifications? Do you know? Do you remember?
A Well, at this point, not yet. This is when I start asking for their documentation.

MR. HINES: Okay. Let's continue.

(Whereupon, the video was played briefly on the record at 1:53 p.m.)

MR. HINES: Okay. I've stopped the video again at 14:26:37.

BY MR. HINES:
Q And what are you holding in your hand?
A Mr. Rios's Texas driver's -- I mean Colorado driver's license.

Q And he handed that to you, correct?
A Yes, sir.
Q Okay. What did you ask him in Spanish?
A Where is he living right now?
Q And what did he respond?
A He said something about living at a hotel right now.
Q Okay. Did he indicate that he understood you were speaking to him?
A Yes, sir.
Q How did he indicate he understood that you were speaking to him?
A Well, he said me, and then he answered my question that I had asked him.
Q Okay. So in your training experience, is that responsive -- that response normal for someone who's understanding your Spanish?
A Yes, sir.
Q And you're able to communicate with them?
A Yes, sir.

MR. HINES: Okay. Let's continue.

(Whereupon, the video was played briefly on the record at 1:54 p.m.)

MR. HINES: Okay. I've stopped that video again at 14:26:49.

BY MR. HINES:

Q What did we just see occur, and what did the passenger say to you, and then what did you say in response?
A He hands me over his phone. And I look at it like, oh, you -- he understands what I'm saying because I'm like oh, you don't have -- And then he says, no this is what I -- like pretty much no, this is what I got. And it's some sort of form on his cell phone.
Q Okay. And at this point, what's your present sense impression? What do you think is happening as he hands you the phone and you're looking at this form on the phone?
A At this point, I still don't know who -- what his identification is. I still don't have proper documentation of who he is.
Q Okay. And is it common that people hand you a phone with a picture of a piece of paper to try to identify themselves?
A No, sir.
Q Has that happened to you before?
A Yes, sir, it has.
Q How often has it happened?
A When they have their driver's license on the phone because they don't have a hard copy on them, they'll hand me their phone, and then -- and so that -- it happens every now and then.
Q Okay. Was this a driver's license that you were looking

at?
A No, sir.
Q Do you remember what it was you were looking at?
A Some sort of documentation, but I don't know that type of documentation. So no, sir.
MR. HINES: Okay. Let's continue.
(Whereupon, the video was played briefly on the record at 1:55 p.m.)
MR. HINES: And I've stopped it again at 14:26:54.
BY MR. HINES:
Q I've noticed you've kept the phone. Why do you keep the phone?
A I'm going to start writing that name and date of birth down.
Q Okay.
(Whereupon, the video was played briefly on the record at 1:55 p.m.)
MR. HINES: Okay. I've paused the video again at 14 minutes and 27 seconds -- 14:27:21. I apologize.
BY MR. HINES:
Q What's the conversation that's going on here?
A I'm asking them where they're from.
Q Okay. And what does the person in the back tell you?
A The back left passenger tells me he's from Venezuela.
Q Okay. And what did the front driver tell you?

A He tells me he's from Cuba.
Q Okay. Does that have any particular significance to you?
A Yes, sir.
Q What's the significance of that to you?
A Possibly some human smuggling going on.
Q Okay. And why do you believe at this point that there's human smuggling going on?
A The location from where they were coming from, the behaviors of rolling up the windows, the smoking of the cigarette, the possible nervousness of the back left passenger.
Q Okay.
A The no documentation from the back left passenger.
Q Okay. And you've been an officer for seven years, correct?
A Yes, sir.
Q Is human smuggling something that you've worried about the entire seven years of your career?
A Not necessarily, sir.
Q At what point did human smuggling begin to become a concern for you?
A Well, it started on the west side of patrolling. That's when we started getting a big influx of human smuggling going on, especially on the (indiscernible) Borderland area. And

then now working gangs, there's been another influx of human smuggling going on, as well.

Q Okay. And over the course of this summer, did you work any cases involving human smuggling?

A Yes, sir.

Q And how many --

MS. BATALLER: Objection, Your Honor. Relevance.

MR. HINES: Your Honor, it goes to whether or not she has the training and experience to have an articulable factor that there's an alien smuggling event going on that she can investigate.

THE COURT: The objection's overruled. Go ahead.

BY MR. HINES:

Q Did you work any alien smuggling cases over the summer?

A Yes, sir. We did.

Q How many cases have you worked?

A We had two cases, sir.

Q And it was just two traffic stops, or what was it?

A Those were -- it was gang-related, but we worked up a case on human smuggling.

Q Okay. Have you pulled over vehicles for people being smuggled before?

A Yes, sir.

Q How many times have you done that?

A We were working ops about a year ago. We were working

daytime hours, like three in the morning, where we were assisting a lot with that. And then recently, this summer again, we started working the TDA ops over at downtown area. So I would say at least 100 times.

Q Okay. And you said you're working TDA ops?

A Yes, sir.

Q What does that mean?

A That's the Tren de Aragua.

Q What is Tren de Aragua?

A They're a gang that's now starting to really grow here in the United States.

Q And where are they from, do you know?

A Venezuela.

Q Okay. And where did the backseat passenger say he was from?

A Venezuela.

Q Okay. So at this point, what are you -- not this point now today, but where the video is paused, what are you thinking as you learn that the driver is from Cuba and that the backseat passenger is from Venezuela?

A Well, at that point, the front right passenger is also saying she's from Venezuela. So at this point I'm thinking, wait a minute, there's a Cuban with two Venezuelans inside the car.

Q And does that indicate anything to you, based off of

your experience, with investigating alien smuggling cases?

A Yes, sir.

Q What does it indicate?

A It indicates that there's possible human smuggling going on or occurring in my presence.

Q Okay. In a vacuum, when you believe an alien smuggling events going on, what is the next steps that you take?

A Luckily with my agency, we work hand-in-hand with a Border Patrol agent and a Detective Lucero (phonetic), who works hand-in-hand where he'll at least weekly go to meetings about the Venezuelans and TDA operations and all that good stuff. So they're up to date with that.

Q Okay. I'm asking like procedurally, what is -- actually, let's take a moment here.

MR. HINES: And if I could indulge the Court and Defense, I'd like to lay out what a normal traffic stop looks like, and then what a traffic stop where the defendant -- or where the witness is investigating alien smuggling would look like academically in a vacuum, and then compare that versus what she actually does in this case.

May I proceed down that line of questioning?

MS. BATALLER: I mean, I'd have to hear what the questions are.

MR. HINES: Okay. I just wanted you guys to know --

THE COURT: All right.

MR. HINES: -- as I do it, Adam has a reason for doing this and he's not taking us.

THE COURT: And, Mr. Hines, do not address Counsel, address the Court.

MR. HINES: I apologize, Your Honor.

THE COURT: Okay. Go ahead and ask your questions.

MR. HINES: Okay.

BY MR. HINES:

Q So in a normal traffic stop, in a vacuum, do you run everybody's name?

A Yes, sir.

Q And what are you checking for when you run everybody's name?

A Warrants check, making sure that nobody's being kidnapped or making sure they're not outstanding criminals.

Q Okay. And in an alien smuggling event, what are you checking for when you think an alien smuggling event's going on?

A Well, making sure that that person that is involved isn't wanted for human smuggling. Okay.

Q And you testified earlier that you pulled this vehicle over as a traffic infraction, correct?

A Yes, sir.

Q Okay. At this point, are you still investigating the

traffic infraction?
A No, sir.
Q What are you doing at this point?
A Now I'm making sure that another offense like human smuggling or narcotics distribution is not occurring.
Q Okay. And what do you need to do in order to make sure that this is not a human smuggling event or a narcotics event?
A I need to make sure that I have proper documentation from everybody inside the vehicle. And then I'm going to have everybody step outside of the vehicle.
Q Okay. Why do you have everyone exit the vehicle?
A One, for my and my partner's safety. But two, to investigate further with getting proper documentation, with continuing my investigation on the narcotics and human smuggling.
Q Okay. And how do you ensure that everyone's documentation is authentic or accurate, or that they have permission to be or remain in the United States?
A Well, I usually ask for proper documentation like passports, proper IDs from their countries or wherever they're from. And sometimes they'll even hand me some paperwork. But at this point in time, I don't have that on two of the subjects.
Q Okay. Is there a way for you to run someone's name to

determine whether their documents or paperwork is valid?
A Yes, sir.
Q What does that look like?
A That's when I could call for assistance with Detective Lucero, who works hand-in-hand with Border Patrol Agent Freddy (phonetic).
MR. HINES: Okay. So we'll continue here at this point.
(Whereupon, the video was played briefly on the record at 2:03 p.m.)
MR. HINES: Okay. I've paused the video again at 14:27:45.
BY MR. HINES:
Q What is it that you said in Spanish, and then what did the backseat passenger do in response to that?
A I asked him if he could (In Spanish) so if he could turn his cell phone on a little brighter so I could write down his name and date of birth.
Q Okay. And then you said something else to your partner there?
A Yes, sir.
Q What did you say?
A I asked him if he call -- if he could go onto our gang channel on our radios and ask for assistance with Officer McKenzie.

Q Okay. And who is Officer McKenzie?
A He is also in our unit, but he is with our K-9 section, a narcotics K-9.
Q Okay. So what is his role with your unit and with the narcotics K-9 section?
A He assists with his narcotics K-9 with running his dog throughout the exterior of the vehicle, giving us probable cause to enter that vehicle.
Q Okay. And why did you call for him at this point?
A Because I believe that there's some sort of narcotics inside that vehicle.
Q Why do you think there's narcotics in the vehicle?
A The location from where they're coming from, the way the passenger stuck his head out of the window with a cigarette in his hand while the windows were rolled up. There's a lot of things in that vehicle. There's a lot of bags. I don't know if those bags have narcotics in them.

MR. HINES: Okay. Let's continue the video.

(Whereupon, the video was played briefly on the record at 2:04 p.m.)

MR. HINES: Okay. I paused the video again at 14:28:34.

BY MR. HINES:
Q And what's the conversation you're having with the person in the backseat?

A I'm asking if there's any illegal drugs or weapons inside the vehicle.
Q Okay. Before you ask that question, what's the conversation you were having in Spanish with the person in the backseat?
A Can you replay that, sir?
Q Yeah, very briefly. I'll come back.
(Whereupon, the video was played briefly on the record at 2:06 p.m.)
BY MR. HINES:
Q So the person in the backseat shows you their phone, and then you ask them a question, and there's a response. Do you know what that was?
A Yeah. So I'm asking him how old is he, and he says he's 21.
Q Okay.
A (In Spanish).
Q Why are you writing down that biographical data?
A I'm making sure that the information that he gave me is lining up to how old he is, just making sure he's not getting caught up in a lie or lying to me.
Q Okay. And in the course of your experience with human smuggling events or alien smuggling events, have you seen documents that would allow people to be in the United States?
A Yes, sir.

Q What does that generally look like?
A It's a good amount of papers. Like, it depends on how many they have, like three or four papers stapled together. But it'll have, like, the United States versus, and then it'll have their name, and then it'll have very little to their information on that documentation. And then it has, like, a Court order date.
Q Okay. And is that what you were looking at on this person's phone?
A I don't recall, sir, but I don't think so.
Q Okay. And you've seen those in the past. You would have recognized it if you saw it?
A Yes, sir.
Q Okay. Have you had experience with those being forged or faked?
A Yes, sir.
Q And how do you know that they were forged or faked when you found out they were forged or faked in other cases?
A Because when we had Border Patrol working with us, they have better resources to check. And that's when they've advised us that that was not the correct information.
Q Okay. And then after you had asked the person in the backseat their name, you asked another question. And what did you say that was?
A I said if there was any drugs or weapons inside the

vehicle.
Q And did the person in the backseat respond?
A No, sir.
Q Who responded?
A I don't recall if --
Q Let's play it forward.
A -- anybody responded.

(Whereupon, the video was played briefly on the record at 2:08 p.m.)

BY MR. HINES:
Q Okay. So did the person in the back respond to your question about whether there were drugs or weapons in the vehicle?
A No, sir.
Q Okay. Who responded?
A The front driver briefly nods his head.
Q That's the Defendant in this case, right?
A Yes, sir.
Q Okay. What does that indicate to you in your thousands of traffic stops and your hundreds of narcotics investigations and your alien smuggling investigative experience?
A That there possibly is illegal narcotics or weapons inside that vehicle.
Q And why do you believe that?

A Because of many previous arrests.
Q Okay. But what is it that this Defendant did specifically that we just saw on video that makes you think that?
A He doesn't answer my question.
Q And what does he say instead?
A What's the reason for my -- what's the reason that you're pulling me over? What's the reason for the traffic stop?
Q Okay. And a standard vanilla speeding traffic stop, what does that exchange normally look like?
A They'd say no. They'd tell me no, and then they would even -- sometimes they even tell me you could go ahead and search my vehicle.
Q Okay. But this Defendant did not?
A No. No, sir.
Q So he diverted to what subject?
A He -- to asking what the reason for the traffic stop was, why he was being pulled over.
Q And what did you tell him?
A That's when I'm trying my best in Spanish and using my hands to explain to him the reason for the traffic stop.
Q Which was?
A The fail to signal left turn.
Q Okay. And it appeared that there's some sort of a

language barrier here?
A Yes, sir.
Q Did you guys resolve that, though?
A Yes, sir.
Q How do you know that it's resolved?
A Well, because he says oh, and then he, like, looks back and he points into the direction. He knows it's the left hand. And he says something about it being damaged or broken.
Q All right. We're --
A And then he nods his head yes, like acknowledging the reason for the traffic stop.
MR. HINES: And we're going to continue playing, then.
(Whereupon, the video was played briefly on the record at 2:10 p.m.)
BY MR. HINES:
Q Okay. Now, you've stepped away from the vehicle here. I paused it again at 14:28:52. Is that correct?
A Yes, sir.
Q Why did you leave the vehicle at this point?
A I'm going to go get gloves.
Q And why do you want to have gloves on?
A I don't want to take home any diseases to my son.
Q What are you getting ready to do?

A Get them out of the vehicle.
Q And what are you going to do?
A Put on the gloves.
Q Okay. Right here, there's a paper. I've paused it again at 14:28:54. There's a paper that you're holding. What is this paper? Do you remember?
A Yes, sir.
Q This is the paper that my partner handed me from the front right passenger inside that vehicle, the female.
Q Okay. Can you read what it says at the top?
A No. I can't read that, sir.

MR. HINES: Your Honor, would it be possible to allow the witness to move closer to the screen to see if she's able to read the top of the screen?

THE COURT: That's fine. She'll have to come back to the microphone.

MR. HINES: Yes.

BY MR. HINES:
Q Okay. Officer, you had a chance to get up and see the screen closer. Were you able to read what's at the top of that?
A Yes, sir.
Q What does it say? Do you know?
A It's notice to appear.
Q And is that what you were referencing earlier when you

were describing the type of documentation?
A Yes, sir.
Q And is this the kind of paper that you would normally see?
A Yes, sir.
Q Okay. This paper came from who?
A The front right passenger, the female.
Q Okay. And the person in the back did not have a paper like this?
A No, sir.
MR. HINES: Okay. Let's continue.
(Whereupon, the video was played on the record from 2:12 p.m. to 2:13 p.m.)
MR. HINES: I paused the video at 14:29:51.
BY MR. HINES:
Q What's the conversation you're having with the occupants of the vehicle at this point?
A I'm telling the front -- the driver, Mr. Rios, to exit the vehicle.
Q Okay. And why do you do that at this point?
A Because my partner is going to pat him down for any weapons.
Q Okay. And is that something that you do in a traffic stop where someone just failed to signal a left turn?
A No, sir.

Q Okay. So why do you do it here?
A Well, if I'm going to have somebody step out of the vehicle, I do always pat down everybody that I have exit the vehicle. I do. Yes, sir.
Q Okay. And what's the purpose of patting them down?
A Making sure they'll have weapons on them.
Q Okay. And at this point, why are you having them exit the vehicle?
A Because at this point, I want to separate them from the vehicle to further my investigation.
Q Okay. And what are you trying to investigate?
A The human smuggling or possible narcotics.
MR. HINES: Okay. Let's continue.
(Whereupon, the video was played briefly on the record at 2:14 p.m.)
BY MR. HINES:
Q Now, I notice the back passenger is still sitting in the back.
A Yes, sir.
Q Why is that?
A Because my partner -- it's common practice for us to take one person out at a time.
Q Why do you take one person out at a time?
A Just in case they do have a weapon.
MR. HINES: Okay. Let's continue.

(Whereupon, the video was played briefly on the record at 2:15 p.m.)

MR. HINES: Okay. I've paused it again at 14:30:40.

BY MR. HINES:

Q At this point, you've entered into a conversation with the Defendant?

A Yes, sir.

Q And what are you two saying to each other?

A He's asking me, this is -- you pulled me out because of a traffic stop, correct? And then I acknowledge him. I say, yes, because of your light, to which he understands. And then I think he's -- at this point he's asking well, then why are you taking me out of the vehicle.

MR. HINES: Well, let's continue and see what he says.

(Whereupon, the video was played briefly on the record at 2:15 p.m.)

MR. HINES: All right. I've stopped it again at 14:31:00.

BY MR. HINES:

Q What was the exchange that we just heard?

A I'm trying my best to explain to him. He's asking me why, and I'm explaining, do I know you? Do you know me? No. I need to make sure that there's nothing inside that vehicle

that shouldn't be in that vehicle.
Q Okay. Why are you pulling them out and you're going to -- and separating them?
A Because I'm going to start investigating the illegal narcotics or the human smuggling.
Q Why not tell him that?
A I don't want him to know that.
Q Why do you not want him to know that at this point?
A At this point, I don't want him to know that because I don't want him -- the female's not talking a lot. So at this point, I don't want him to start telling her or him what to say to answer for them. I don't want him to run from us at this point. At this point, I don't want to tell him too much of what's going on in my mind.

MR. HINES: Okay. Let's continue the video.

(Whereupon, the video was played briefly on the record at 2:17 p.m.)

MR. HINES: I paused it again at 14:31:07.

BY MR. HINES:
Q There's a person who just walked across the back of the screen. Did you see that person?
A Yes, sir.
Q Who is that person?
A It's Officer McKenzie.
Q And is that the person that you had your partner call

for?
A Yes, sir.
MR. HINES: Okay. And let's continue.
(Whereupon, the video was played briefly on the record at 2:17 p.m.)
MR. HINES: Okay. I've paused it again at 14:31:18.
BY MR. HINES:
Q You're making an X symbol with your hand.
A Yes, sir.
Q Why are you doing that?
A I'm having them extend their legs and cross their legs.
Q What's the purpose of that?
A I've had many subjects run from me.
MR. HINES: Okay. Let's continue.
(Whereupon, the video was played briefly on the record at 2:18 p.m.)
MR. HINES: I paused it again at 14:31:55.
BY MR. HINES:
Q Can you summarize the exchange that we just heard between you and Officer McKenzie?
A Yes. I'm telling him the reasons for the traffic stop and pretty much our observations with the traffic stop, the rolling up of the windows, the driver kind of giving us a hard time with the traffic stop, the smoking of the

cigarette, everything that I'm seeing and smelling or feeling at this time.
Q Okay. And you've been a lot more expressive about what it is you thought and felt and were perceiving today, correct?
A Yes, sir.
Q Why be brief at that point when you're with Officer McKenzie? Why not tell him all the stuff that you've said today?
A With Officer McKenzie?
Q Yes.
A With what --
Q So with Officer McKenzie, you just had basically like a 30-second or less exchange, correct?
A Yes, sir.
Q And today you've given the Court very detailed reflections and perceptions of what you were perceiving and feeling, correct?
A Yes, sir.
Q You've been on the stand for almost an hour now, right?
A Yes, sir.
Q Why not give that much detail to Officer McKenzie?
A Well, at that point in time I don't want -- my partner is by himself with three other subjects. So I'm just giving him the meats and potatoes pretty much of what we observed,

the reason for the traffic stop, so he can go ahead and conduct his investigation.

MR. HINES: Okay. Let's continue.

(Whereupon, the video was played briefly on the record at 2:20 p.m.)

MR. HINES: Okay. I've paused it again at 14:32:18.

BY MR. HINES:

Q What's the conversation you just had?

A I'm having them scoot back a little bit more, far enough to where they're separated from the vehicle, but to where they could still see the vehicle, because Officer McKenzie is going to run his dog.

Q Okay. And at some point there, you pointed to your body cam.

A Yes, sir.

Q What was that part of the conversation?

A I'm telling him because I see the driver, he like hits, not hits, but he points at the passenger's phone. And I'm telling him, like, I don't want him calling other people, I don't want him -- they're coming from a location that's in close proximity. So I don't want them to start bringing more people to our traffic stop. So I'm telling him hey, everything is being recorded right here.

Q Okay. And why don't you want more people coming to the

traffic stop?
A For my safety, for my partner's safety, for their safety. There's only three officers right now on this scene.
Q And how many people were in the vehicle?
A Three.
Q Okay.

(Whereupon, the video was played briefly on the record at 2:21 p.m.)

MR. HINES: Okay. I've paused it again at 14:32:53.

BY MR. HINES:
Q And it appears to me you've made a phone call. Is that correct?
A Yes, sir.
Q Who did you call?
A Detective Lucero.
Q Okay. And why are you calling Detective Lucero?
A He works hand-in-hand with our Border Patrol agent, Freddy, that works at the Texas Anti-Gang Center with us.
Q Okay. And on a normal traffic stop, do you call him?
A No, sir.
Q What are the only times where you would call him?
A When I believe there's some sort of human smuggling going on, or when I'm unable to get a positive identification from, I guess, non-U.S. residents.

Q Okay. And how long -- okay. Let me rephrase this question. I apologize. What is your next step after you get off the phone with him?

A This is when I'm going to start conducting a warrants check or trying to obtain positive identification through our MCT.

Q Okay. In a normal stop where you suspect that an alien smuggling event is occurring of some kind, or a human smuggling event of some kind, is there a scenario where you check everyone's names, everything checks out, and then they get back in the car and they leave?

A Yes, sir.

Q Okay. How long does it generally take you, in a vacuum, on a normal stop that you've conducted to check those?

MS. BATALLER: Objection. Relevance.

THE COURT: Overruled.

THE WITNESS: Can you repeat the question? I apologize.

BY MR. HINES:

Q How long does it take you on an alien smuggling stop to check the documentation and the information that's handed to you, generally?

A Approximately 20 minutes.

Q Okay. And why does it take you 20 minutes?

A Because they've handed me at least some sort of proper

documentation such as passports, the ID cards, resident ID cards from their country.

Q Okay. And do you have the ability to enter that information into a database and receive an instantaneous response?

A Yes, sir.

Q Okay. What happens if you don't receive an instantaneous response?

A That's when I could ask for our resources, better assistance from a Border Patrol agent.

Q Okay. How long does that process generally take?

A Depending on how busy they are, but we have the luxury of us working hand-in-hand with them.

Q How long can that take?

A At least, I would say, 30 minutes.

Q Okay. So in a scenario where someone doesn't have positive identification, are you holding them until you receive in that 30 minutes, yes or no, that they are allowed to be in the country lawfully or they do have permission?

A Yes, sir.

Q Why do you hold them for the duration of that?

A First and foremost, I want to make sure that they're okay, that they're not victims of some sort of crime, such as human smuggling. But two, I also want to make sure they're not outstanding criminals.

MR. HINES: Okay. Let's continue.

(Whereupon, the video was played briefly on the record at 2:25 p.m.)

MR. HINES: I've paused it again at 14:33:09.

BY MR. HINES:

Q And I've just heard you say that there's two Venezuelans and a Cuban and one female. Why are you saying their nationalities and their genders?

A That way he knows pretty much what I have at the scene so he can relay that message to the Border Patrol agent, but just also so he knows that hey, there's also a female here. I want to make sure that she's not being prostituted or smuggled in this case because I'm trying to see that she's not doing much talking.

Q Okay. And why do you believe -- I guess let me ask you another question. You said you've been doing Tren de Aragua interdiction. Is that what you said earlier?

A Yes, sir.

Q And how many of those operations were you on?

A I would say at least 50.

Q Okay. How much training and firsthand knowledge do you have of the Tren de Aragua gang?

A We don't have many documented, sir, because we're still in the process of properly documenting them to label them as a gang here in El Paso. But we deal with a lot of suspected

here in El Paso, predominantly in the hotel areas of downtown.

Q And why are they predominantly in the hotel areas of downtown?

A I believe because it's a cheaper area, possibly.

Q Okay. Do you know how Tren de Aragua makes their money?

MS. BATALLER: Your Honor, I'm going to object to the relevance of this line of questioning. I don't know how Tren de Aragua has anything to do with this. I don't think there's any testimony that every Venezuelan is a member.

MR. HINES: Your Honor, it goes to her state of mind and the investigation, and whether or not she knew that Tren de Aragua was involved in Cice. And she was concerned that this woman might have been trafficked by individuals.

THE COURT: Objection is overruled. Go ahead.

THE WITNESS: They make their money by human smuggling, by transporting of humans, by illegal narcotic distribution, through weapon trafficking, many of those various offenses.

BY MR. HINES:

Q Okay. When you say human smuggling, do you mean what we would call federally alien smuggling, or do you mean trafficking of persons or sex trafficking?

A It would be in our penal code. I believe it's Chapter -- it's Section 20 in our penal code for human smuggling.

Q Okay. Do you know personally, from personal experience or training, whether or not Tren de Aragua is involved in Vice?

A I have not. We have not dealt with that, sir. But we believe that there is a lot of prostitution going on.

Q Okay. And at this point, not today as you're sitting here, but at 2:33 in the afternoon on August 7th, are you concerned that this female is being trafficked?

A Yes, sir.

Q Are you concerned that she's being trafficked for Vice purposes, or do you think she's just being trafficked as, like, what we would call an alien?

A At this point, I don't know, sir. But she's not talking. She's not really making a lot of eye contact with me.

MR. HINES: Okay. Let's continue.

(Whereupon, the video was played on the record from 2:28 p.m. to 2:30 p.m.)

MR. HINES: All right. I'm pausing it here at 14:34:43.

BY MR. HINES:

Q For the purposes of the record, can you say what you're holding in your left hand?

A Yes, sir. That's going to be the documentation that the female passenger handed over to my partner.

Q Is that the only thing you're holding?
A And also Mr. Rios' driver's license from Colorado.
Q And in between those two, what else is there?
A It's my notebook where I have the name of the back left passenger.
Q Okay. And you're about to receive a phone call here?
A Yes, sir.
Q Who's that from? Do you remember?
A Detective Lucero.
Q And what's he tell you?
A He's telling me that he's close by, that he's going to start making his way to our location to better assist us.

(Whereupon, the video was played briefly on the record at 2:31 p.m.)

MR. HINES: Okay. I paused it here at 14:35:37.

BY MR. HINES:
Q What are you beginning to do?
A At this point, I'm going to jump on my -- or get in the vehicle to start checking the subjects for any warrants through our computer, the MCT.
Q You call it the MCT. Do you know what that stands for?
A No, sir.
Q Okay. What do you use it for?
A To run subjects, to run vehicles. If there's a stolen vehicle, it'll pop up and generate through that computer. If

we're on patrol, then our calls and all that information that we need while responding to that call will be on there, as well.

Q Okay. And you say run subjects or vehicles. What do you mean by run?

A Checking for any warrants through the computer.

Q Okay. And what data are you putting in the computer in order to check for the warrants or for any other information?

A I'm putting in their last name, first name, and date of births.

Q And is that the information that's what's in your left hand and you've gathered?

A Yes, sir.

(Whereupon, the video was played on the record from 2:32 p.m. to 2:34 p.m.)

MR. HINES: I'm going to pause it right here at 14:37:26.

BY MR. HINES:

Q You sat down in your vehicle and you started typing on your computer, correct?

A Yes, sir.

Q Do you recall, based off of watching this, whose information you were running at that point?

A Yes, sir. It was the female.

Q Okay. And then you got out of your vehicle. And what

did you do?
A That's when I asked her -- nothing was populating in our database for her name or her information, so that's when I stood up. I went to go ask her what her name and date of birth is.
Q Okay. And why were you asking that?
A Just to make sure that it verified with what was on the paperwork that she handed to my partner.
Q And what's the purpose of asking that question?
A Because no information was coming back. I wanted to make sure that she wasn't lying about her name because I was getting no return on our database that we have.
Q And have you done this before where someone's given you different information that's on the paper?
A Yes, sir.
Q And what does that indicate to you then?
A That they're -- possibly they're victims or offenders on some sort of level or case.

MR. HINES: All right. We'll continue.

(Whereupon, the video was played on the record from 2:35 p.m. to 2:36 p.m.)

MR. HINES: All right. I'm going to pause it real quick. I paused it at 14:38:18.

BY MR. HINES:
Q What did we just see with the three gentlemen that are

behind the board where they're now obscured?

A Now they're walking towards our location. There's a lot of foot traffic that goes on in that area.

Q Okay. What are you thinking when you see that occur?

A Can you repeat that question?

Q So when you see those three people walking up, and then there's a person that just rode a bicycle through, do you think that that's normal or are you concerned in any way?

A At that point, I'm always paying attention to my surroundings. But in that area, there's a lot of foot traffic.

MR. HINES: Continue.

(Whereupon, the video was played briefly on the record at 2:37 p.m.)

MR. HINES: Okay. You're pausing it at 14:38:26.

BY MR. HINES:

Q Your partner just walked up and said something. Do you know what it is?

A No, sorry. I don't at that point.

MR. HINES: All right. Let's continue to play.

(Whereupon, the video was played briefly on the record at 2:37 p.m.)

MR. HINES: Okay. Now, right now, I paused it at 14:39:07.

BY MR. HINES:

Q It seems to be that we're in some sort of a lull.
A Yes, sir.
Q What is this?
A I'm sorry. Can you repeat that?
Q Why are we in a little bit of a holding pattern or a lull here?
A At this point, we're still waiting for Detective Lucero to arrive to the scene.
Q And why are we waiting for him to arrive?
A To make sure that we get positive identification from the two Venezuelans.
Q And why do you need positive identification? I guess let me rephrase that. Did you actually receive any sort of positive identification when you entered them into your computer system?
A No, sir. I got no return.
Q Okay. On both?
A Yes, sir.
Q Okay. So at this point, you would have waited until when to receive that positive identification?
A Until I go through all proper channels to receive that. So whether it's through the MCT, or at least through our EPPD communications channel to obtain that.
Q Okay. And have you done traffic stops that have involved aliens to the United States where they did have

positive identification information?
A Yes, sir.
Q And when that comes back, would that have been in your computer if they sometimes would have had permission to stay or appear?
A Not necessarily. No, sir.
Q Okay. But so then why hold them knowing that that could have been a lawful notice to appear?
A Because at that point, I don't know if it's falsified or if it's incorrect.
MR. HINES: Okay. Let's continue.
(Whereupon, the video was played briefly on the record at 2:39 p.m.)
MR. HINES: Okay. I paused it again at 14:39:26.
BY MR. HINES:
Q What's the conversation you just had with the Defendant in Spanish?
A I asked him if that was his car and he points at him and I say, yes. And then he says yes, it's his.
Q So he's saying it's his vehicle?
A Yes, sir.
MR. HINES: All right. We'll continue.
(Whereupon, the video was played on the record from 2:40 p.m. to 2:41 p.m.)
MR. HINES: Okay. I'm going to pause it right here

at 14:40:18.

BY MR. HINES:

Q What are you doing on the -- is this a phone or a radio that you're speaking into?

A A radio.

Q And what are you doing?

A I'm running through -- I'm running the subjects through our communications.

Q And what are you checking for through the communications channel?

A Making sure that they're not victims, like that they have protective orders or anything like that, and also making sure that they don't have any outstanding criminal warrants.

MR. HINES: Let's continue.

(Whereupon, the video was played on the record from 2:41 p.m. to 2:42 p.m.)

MR. HINES: Okay. I'm going to pause it again at 14:41:29.

BY MR. HINES:

Q What are you continuing to do at this point?

A I'm still running the subjects while we're still standing by for Detective Lucero.

Q Okay. Do you know whether or not there's been a weapon found yet?

A At this point, I don't know, sir.

Q Okay. I'm going to wind the video back and I want you to listen to another part again, and I want to see if you can remember your response here.

(Whereupon, the video was played briefly on the record at 2:43 p.m.)

BY MR. HINES:

Q Okay. Did you listen to that?

A Yes, sir.

Q What did your partner tell you?

A There's a rifle.

Q Okay. Now, I want you to listen and see if you can tell us what your response is.

(Whereupon, the video was played briefly on the record at 2:43 p.m.)

BY MR. HINES:

Q What did you say?

A Shut up.

Q Okay. So, having watched this, do you now remember whether or not a weapon had been found at that point?

A Yes, sir.

Q Okay. So, you knew a weapon had been found, correct?

A Yes, sir.

Q But what did you continue to do?

A My investigation.

THE COURT: Hold on. Oh, the recording stopped?

MR. HINES: Where did you lose me? I can go back.

THE COURT: Should we have the last question asked, or how far back do we need to go? Just right now? All right. Yeah. So re-ask the last question, Mr. Hines. And actually, don't forget to give us a timestamp for this one.

MR. HINES: Thank you, Your Honor. I will.

THE COURT: Okay.

MR. HINES: Okay. For the purpose of the record, I have stopped the video at 14:38:25.

BY MR. HINES:

Q Agent, let's go back a second. Okay. Your partner had walked up to you here while you were holding these papers. What did your partner say to you?

A There is a rifle.

Q And what was your response?

A Shut up.

Q Okay. And I knew -- okay. Let me rephrase this. I'm not going to narrate here. I apologize. We watched a lot of time occur between this moment and the moment we paused it to go back, correct?

A Yes, sir.

Q Okay. During that time, what were you doing?

A I was investigating first the traffic stop, and then possible illegal narcotics or human smuggling.

Q Right. But I'm saying from this moment right here,

14:38:25, to where I stopped and I said let's go back and talk to where you interacted with your partner, correct?
A Yes, sir.
Q Another three, four, or five minutes had occurred, correct?
A Yes, sir.
Q During the course of that time, what are you doing?
A I'm conducting the -- I continue doing what I need to do with trying to obtain some sort of positive identification while waiting for Detective Lucero.
Q Okay. So at this point, why did you detain the individuals on the rocks?
A Because at that point, I still needed to continue my investigation. And now that there's a weapon, that's another investigation.
Q Okay. All right. Did you write a report?
A There's a report generated, but I did not write that report.
Q Okay. Who wrote the report?
A My partner, Officer Matthews.
Q Okay. Is it standard practice that you wouldn't write a report, that only one person would write a report?
A Yes, sir.
Q Okay. Would a report have helped you been able to remember key dates and times and refresh your memory?

A Yes, sir.
Q So why not write one?
A Because my partner wrote it. I reviewed it and read it, but he was the one that wrote it.
Q Okay. And that report -- let me ask it this way. Did you document in any other way besides a report what happened that day?
A No, sir.
Q Did you ensure that there was a recording of that day?
A Yes, sir.
Q So how did you document then?
A Through my body-worn camera.
Q Okay. And did you ensure that it was uploaded and secured?
A Yes, sir.

MR. HINES: Okay. One moment, Your Honor.

THE COURT: Yes.

(Whereupon, there was a brief pause in the proceedings.)

MR. HINES: Your Honor, I would pass the witness.

THE COURT: All right. Ms. Bataller?

MS. BATALLER: Yes, Your Honor. Thank you. I think we need to switch out.

THE COURT: All right. So let's take a recess. We'll be in recess.

THE CLERK: All rise. Court is in recess.

(Whereupon, at 2:45 p.m., a brief recess was taken.)

(Whereupon, at 3:04 p.m., the proceedings reconvened.)

THE CLERK: All rise. This Court is back in session.

THE COURT: Good afternoon. Please be seated.

We're back on the record in this suppression hearing. And now the Defendant is going to start with their cross-examination.

Ms. Bataller, the witness is on the stand, go ahead and commence.

MS. BATALLER: Thank you, Your Honor

CROSS-EXAMINATION

BY MS. BATALLER:

Q Good afternoon, Officer.

A Good afternoon.

Q So just to be clear, when you were at, or by the Motel 6, you weren't surveilling that motel in any way, correct?

A No, ma'am.

Q You weren't watching drug transactions happen or anything like that?

A No, ma'am.

Q All that you actually saw was the Subaru pull out of that hotel parking lot, correct?

A Yes, ma'am.

Q And you didn't have any specific information about

Mr. Santana Rios at that point, correct?
A No, ma'am.
Q In fact, you didn't even know he existed until you pulled him over, correct?
A Yes, ma'am.
Q So when you pulled him over, your sole reason for believing maybe this was a drug crime was that the passenger had a cigarette and the window was rolled up? Is that right?
A No, ma'am.
Q Okay. Then explain to me what was the reason. And also, I apologize, I forgot the stopping longer than normal to decide whether to go north or south?
A And the location from where he was coming from.
Q He was coming from a motel, correct?
A Yes, ma'am.
Q And that motel isn't just entirely a front for crime, correct?
A (No audible response)
Q There's legitimate business going on at that hotel, correct?
A Yes, ma'am.
Q It's used as a lodging place for people, correct?
A Yes, ma'am.
Q And people legitimately use it for lodging oftentimes, correct?

A Yes, ma'am.
Q And people who leave hotels typically have luggage with them, correct?
A Yes, ma'am.
Q Now, you testified -- I want to talk about the cigarette again. You testified that that's evidence of a drug offense occurring. It's also evidence of someone having a cigarette addiction, correct?
A Can you repeat that?
Q You talked about the cigarette, the passenger smoking a cigarette being evidence that there was a drug crime occurring. But smoking a cigarette is also evidence that that person has an addiction to cigarette smoke, or to smoking cigarettes, correct?
A Not as evidence, ma'am.
Q Okay. So, people that aren't addicted to cigarettes smoke cigarettes?
A Yes, ma'am.
Q Okay. Let me say this in a different way. Typically, if you see a person smoking a cigarette, it's because they have a cigarette addiction, correct?
A Yes, ma'am.
Q I want to talk a little bit more about this neighborhood where you performed the stop. This is -- when you're saying this is a high crime neighborhood, is that compared to other

neighborhoods in El Paso or other neighborhoods in the country?
A In El Paso, ma'am.
Q Okay. And in El Paso -- El Paso, for a city of its size, is a relatively low crime city, correct?
A The crime is starting to rise, ma'am.
Q It's starting to rise, but I'm asking about the levels. At this point in August of 2024, we still were considered a very low crime area for the country, correct? For cities of that size.
A Not necessarily. No, ma'am.
Q Now, this was -- you said this was a day shift, correct?
A Yes, ma'am.
Q So you were there during the daylight hours?
A Yes, ma'am.
Q And in that part of El Paso, there's various businesses, correct?
A Yes, ma'am.
Q There's a social security office in the neighborhood?
A Yes, ma'am.
Q There's a doctor's office?
A I'm sure yes, ma'am.
Q And there's, like you said, other hotels, correct?
A Yes, ma'am.
Q So, obviously, there's people living in the

neighborhood?
A Yes, ma'am.
Q There's people working in the neighborhood?
A Yes, ma'am.
Q Much of the business that takes place in that neighborhood is law-abiding business, correct?
A Yes, ma'am.
Q So this Valero gas station that you stopped Mr. Santana Rios at, it was just within the same block as the Motel 6, correct?
A Yes, ma'am.
Q Now, when you pulled over the vehicle, you testified that you told the individuals inside to roll down the windows, correct?
A Yes, ma'am.
Q But you originally said it in English, correct?
A Yes, ma'am.
Q Because you didn't know they spoke Spanish, correct?
A Yes, ma'am.
Q And pretty soon after, they did roll down the windows, right?
A The back left passenger, yes, ma'am.
Q So, he rolled down the window, correct?
A Yes, ma'am.
Q And you complied with your order to do so, correct?

A Yes, ma'am.
Q And then you started to speak in Spanish, is that right?
A Yes, ma'am.
Q Because you understood that they wouldn't have understood you in English?
A At that point in time, I did not know.
Q But you realized that you had a language that you could speak with them in, correct?
A Yes, ma'am.
Q And that was Spanish, right?
A Yes, ma'am.
Q And they didn't appear to be responding when you spoke to them in English, right?
A Yes, ma'am.
Q But then they did respond when you spoke to them in Spanish, correct?
A No, ma'am.
Q They didn't respond when you spoke to them in Spanish?
A I said "ventanas," and I had to physically knock on the window.
Q Okay. So let's just play that again. I am putting on what's been marked, or what's been admitted, as Government's Exhibit 1, I believe. And I'm just going to play it from my --

(Whereupon, the video was played on the record at 3:10

p.m.)

MS. BATALLER: And we'll just watch the beginning. I'm starting from the beginning so that you can see the interaction again.

(Whereupon, the video was paused at 3:11 p.m.)

BY MS. BATALLER:

Q Did you hear what he just said right there? (In Spanish), what does that mean?

A He understands that, yes, yes, windows.

Q And then what does he do right after?

A After I knock on the window --

Q Yes.

A -- he lowers it.

THE COURT: Ms. Bataller, if you can please give us a timestamp.

MS. BATALLER: I apologize. Thank you, Your Honor. I stopped it at 14:26:07.

THE COURT: Okay.

BY MS. BATALLER:

Q So at this point, he complied with your order, correct?

A Yes, ma'am.

Q And the back passenger, you said to throw out his cigarette, right? You told him to do that?

A My partner.

Q Okay. And he did do that, correct?

A Yes, ma'am.
Q So he threw out the cigarette. You asked then Mr. Santana Rios to show his identification, right?
A Yes, ma'am.
Q And he complied with you, right? He did that?
A Yes, ma'am.
Q And he showed you a valid Colorado driver's license, correct?
A Yes, ma'am.
Q Now, there's no tinting on the windows, correct?
A Yes, ma'am.
Q And so at this point, you could see in the vehicle, correct?
A Yes, ma'am.
Q And no one had any gun within plain view, correct?
A Not that I could see at that point in time.
Q Okay. You couldn't see any drugs either in plain view?
A No, ma'am.
Q Now, then you asked the back seat passengers, or sorry, the woman in the front and the man in the back for their documents. And he immediately complies, the back seat passenger, correct?
A Yes, ma'am.
Q And he shows you immigration documents, correct?
A I don't know what documents they were.

Q So you're not -- you don't, in your daily work, see notices to appear from immigration Court?

A Yes, ma'am.

Q But he showed you a notice to appear, correct?

A I don't recall if it was a notice to appear, ma'am.

Q And pretty soon into the stop, you realized that the passengers were Venezuelan, you testified, correct?

A Yes, ma'am.

Q And it's all over the news right now that Venezuelans are typically paroled into the United States, correct?

A (No audible response)

Q Meaning they're allowed to stay here?

A Not necessarily.

Q And when you asked them for their documents, you never asked them, do you have permission to be here, did you?

A No, ma'am.

Q You didn't ask them if they were seeing an immigration judge?

A I'm not Border Patrol. No, ma'am.

Q Okay. And you didn't call Border Patrol either, did you?

A Yes, ma'am.

Q When did you call Border Patrol?

A Well, I called Detective Lucero, who works hand-in-hand with Agent Freddy that works at the Texas Anti-Gang Center

with us.
Q So did you call that Border Patrol officer, or did you call someone in your unit?
A Yes, ma'am. My apologies, I called Detective Lucero.
Q Because typically when you stop someone and think there's undocumented people in the car, the first thing you do is call Border Patrol, correct?
A No, ma'am.
Q You don't?
A No, ma'am.
Q Because you're an expert in immigration?
A No, ma'am.
Q And you didn't ask them for any more documentation at any point, did you?
A No, ma'am.
Q It's Border Patrol and ICE that have the most information on immigration offenses, correct?
A Yes, ma'am.
Q And a K-9 is unable to tell whether someone's undocumented or not, correct?
A Yes, ma'am.
Q It's correct that they're unable to tell, correct?
A Yes, ma'am.
Q But you called the K-9 almost immediately into the stop. I think it was at minute two when your body camera starts

that you called the K-9?
A Yes, ma'am.
Q This was well before you ever ran Mr. Santana's license plate for warrants, correct?
A Yes, ma'am.
Q And it was well before you called in any information about the passengers, correct?
A Yes, ma'am.
Q Because you didn't actually put the passenger's information and Mr. Santana's information into your system until about ten minutes into the stop, correct?
A Yes, ma'am.
Q And you didn't call Detective Lucero until about fourteen and a half minutes into the stop, correct?
A Yes, ma'am.
Q But at about minute four, you pulled everyone out of the vehicle, right?
A Yes, ma'am.
Q And this was also before you ran their IDs, correct?
A Yes, ma'am.
Q And no new information had arose other than the fact that someone was smoking a cigarette with the windows rolled up, and they made that weird stop, and this is what you call a high crime area to suggest a crime was occurring, correct?
A No, ma'am.

Q Once these people were taken out of the car, you wouldn't have let them leave at any point, correct?
A Can you restate that?
Q Once you took the people out of the car, you wouldn't have let them leave at any point, correct?
A Yes, ma'am.
Q They were detained, right?
A Yes, ma'am.
Q And you made them sit across the parking lot in the sun, is that right?
A Yes, ma'am.
Q And even when Mr. Santana Rios asked to get out of the sun at one point, you told him he could not, correct?
A Yes, ma'am.
Q And as you testified before, you made them cross their legs?
A Yes, ma'am.
Q You made them put their phones down?
A Yes, ma'am.
Q And just to be clear, during this detention, while Mr. Santana was being held away from the vehicle, he had no physical access to the car, to the Subaru, right?
A Yes, ma'am.
Q And Mr. Santana at one point said to you, why are you searching my vehicle if you stopped me for a traffic

infraction? Something of that nature?
A Yes, ma'am.
Q And you said it's because you didn't know what was in the car, correct?
A I'm trying my best to explain that. Yes, ma'am.
Q Because at that point, you really had no idea what was in the car, right?
A Yes, ma'am.
Q And at that point, they had been asked whether they had contraband in the car and they said no, correct?
A That's incorrect, ma'am.
Q When did they say that they had -- did they say that they had contraband in the car?
A No. They did not say they had contraband in the car.
Q Okay. So at no point up until then did they say that they had contraband in the car, correct?
A Correct.
Q Now, while everyone's waiting outside, detained outside of the vehicle and across the parking lot, the dog eventually came, correct?
A Yes, ma'am.
Q This was about, I think, nine minutes into the stop. That's seven minutes after you said you were going to call Ryan McKenzie, correct?
A Can you repeat that, ma'am?

Q Sure. Sorry, it was kind of a long question. That was about nine minutes into the stop when the dog started going around the vehicle?
A I can't speak on behalf of when he actually had the dog around the exterior of the vehicle, ma'am.
Q Okay. I'm going to show you, and I think it's just a brief second where you can see it, but let me go to minute nine. I'm going to show you, and I'll see what the timestamp is on there. So this is, I'm going to show you starting at 14:34:39 when you start running their documents.
(Whereupon, the video was played briefly on the record at 3:19 p.m.)
BY MS. BATALLER:
Q I'm going to pause it at 14:35. I don't know if you were looking at the Subaru. But did you see Officer McKenzie there with his dog at that point?
A No. I just observed Officer McKenzie.
Q Okay. But you would admit that you were not checking their documents until after Ryan McKenzie got there, correct?
A Yes, ma'am.
Q And much later, you called Detective Lucero to check on the immigration documents, correct?
A Yes, ma'am.
Q Now, when you did run that information, I'm thinking specifically about Mr. Santana's Colorado license, it came

back negative for warrants, correct?
A Yes, ma'am.
Q And there was nothing else that you found that suggested he was committing any crime when you looked up his license, correct?
A Yes, ma'am.
Q One moment, please. I did want to go back real quickly to talk about when you first started speaking to these individuals and realized that they spoke Spanish. It is not strange in El Paso to encounter people that don't speak English, correct?
A Yes, ma'am.
Q And it oftentimes has nothing to do with their immigration status whether they speak English or not, correct?
A Yes, ma'am.
Q There are plenty of U.S. citizens who speak only Spanish, correct?
A Yes, ma'am.
Q In fact, your grandparents spoke only Spanish, correct?
A Yes, ma'am.
Q Now, at some point in this interaction, you turned off your body camera for 17 minutes, right?
A I don't recall the length.
Q Okay. But you did turn off your body camera, correct?

A Yes, ma'am.
Q And body cameras are used to protect both you and the people involved in a traffic stop, correct?
A Yes, ma'am.
Q So that we have a good record of what actually happened?
A Yes, ma'am.
Q And as you testified earlier, this video is the best record that you have because you didn't write a report?
A Yes, ma'am.
Q But we don't have the benefit of that for those 17 minutes, correct?
A Yes, ma'am.
Q Because you decided to turn off your body camera?
A Yes, ma'am.
Q And under what policy is that allowed?
A I was not interacting with the subjects involved.
Q Okay. But you turned off your body camera in the middle of a traffic stop, correct?
A Yes, ma'am.
Q That had evolved into something else, correct?
A Yes, ma'am.
Q Now, I want to talk about a case that is similar to this one. And that's the case of Christian Melendez (phonetic).
MR. HINES: Your Honor, at this point I don't know that the proper predicate has been laid to try to impeach

this witness with prior testimony in another case.

MS. BATALLER: It goes straight to credibility, Your Honor. And I can approach if that would help.

THE COURT: Okay. Go ahead and approach.

(Whereupon, from 3:22 p.m. to 3:24 p.m., a bench conference was held, not transcribed)

MS. BATALLER: So, Your Honor, just to reiterate, I think that it goes to this officer's credibility. Judge Guaderrama's determination was that her testimony that there was marijuana residue on the floorboard was unreasonable, that determination was unreasonable, which suggests that the testimony about that was unreasonable.

And it also goes on to talk about how there was various officers who looked in the vehicle and never saw marijuana there. So that cut against the argument that there was marijuana on the floor. And that's what she gave for the reason that there was reasonable suspicion in that case, that she saw marijuana residue, so there's a drug crime.

THE COURT: All right. So, okay. Give us the name of the case, again the case number.

MS. BATALLER: It's United States v. Melendez. And I -- we put it in the reply. I think we have the -- I think Chelsea (phonetic) over here might have the case number. It's in our reply. We know that case. It's United States v. Melendez. It's Christian Melendez. And it's 23-CR-2276.

THE COURT: All right. So --

MS. BATALLER: And this information is at Page 21.

THE COURT: Okay. And so your purpose for going into this case with a witness is what, specifically?

MS. BATALLER: For credibility. It goes directly to her credibility, Your Honor. Her similar testimony was found unreasonable before.

THE COURT: All right. Let me hear a response from Mr. Hines. Do you need a little time, Mr. Hines?

MR. HINES: No, I'm ready, Your Honor. Would you like me to approach the podium? Or do you want me to just lean down into the mic here?

THE COURT: Okay. Just lean down and be clear.

MR. HINES: Okay. Thank you, Your Honor. So my concern here is that this officer -- Judge Guaderrama, specifically says on Page 21 of his filing, and what Defense is alluding to, is this statement itself. "However, Officer Gonzalez made the finding after glancing at the vehicle's floorboard." At no point did she make any attempt to verify in any way that the residue was in fact contraband with a footnote, which cites to a transcript where it says Officer Gonzalez admitted that she did not collect or test the residue.

And then there's another cite to a transcript where it says Officer Gonzalez admitted that there is no way to see

the marijuana residue on her body camera video. And then, Judge Guaderrama concludes, "Thus, Officer Gonzalez's suspicion of additional criminal activity was not reasonable, and reasonable suspicion requires a firm belief that criminal activity is afoot, and that was not the case here."

He didn't rule that she was unreasonable. He said her suspicion was not reasonable. That goes to the heart of a finding of law that is not a Giglio finding, Your Honor.

MS. BATALLER: Your Honor, if I could just note, I can go further on that page. It says, "Furthermore, none of the other officers on the scene could verify that the residue existed. In fact, before the K-9 sniff took place, Officer Rodriguez can be heard saying two separate times that he does not believe there is any contraband in the car.

"Then, once on the scene, contrary to Officer McKinney's (phonetic) testimony that his K-9 passively alerted to the door, neither the K-9 nor the EPPD officers who searched the defendant's vehicle had any interest in the 'residue' on the driver's side floorboard. Taken together, the officers clearly lacked the reasonable suspicion needed to extend defendant's detention for the K-9 sniff."

And that's just basically saying that the evidence didn't match up with what she was testifying to later.

THE COURT: And your point, Mr. Hines, then?

MR. HINES: Your Honor, my point would be if you

look at Page 7 and Page 8 of this same opinion, what Defense Counsel is alluding to where she's trying to, for an essence, use United States v. Giglio to attack the credibility of this witness actually occurs to another officer in that instance. In this instance on Page 7 and continuing to Page 8, Judge Guaderrama writes, Your Honor, "The Court is forced to take the handler's word on this."

And then he cites to a case called the United States v. Lopez (phonetic) where it says that a K-9's alerting behavior is particular to a dog because each dog alerts in a different way. "However, after considering the handler's testimony and accompanying video recordings of the K-9 sniff, the Court declines to find Officer McKinney's testimony about the K-9 alerts credible because he failed to articulate specific reasonable examples."

These are not findings that the officers lied. These are not findings that the officers were being deceptive. These are not findings that the officers intentionally misled the Court. This is a conclusion of law where he's saying their belief at the time was not objectively reasonable under the reasonable standard, versus their subjective belief at the time that it was reasonable.

MS. BATALLER: And, Your Honor, I don't agree with that premise. But even if we did, I think that still is relevant because she clearly, in that case, also didn't

understand what reasonable suspicion was and made determinations based on that false belief of reasonable suspicion that led to her doing the same thing as she did here.

MR. HINES: That is not -- it's not exactly an apples to apples or an oranges to oranges comparison, Your Honor. She did not testify that she saw any sort of narcotics paraphernalia in plain sight or anything of that nature. Therefore, it is not directly analogous and it's not the same thing that she did in this specific instance.

And second, I would just again urge the Court these are conclusions of law made by Judge Guaderrama. They are not determinations that the witness lied. They're not determinations that the witness provided untruthful testimony. They're conclusions of law as to the objective reasonableness under the reasonableness standard versus I find this person to have deceived me or to no longer be telling the truth.

THE COURT: All right. So this is what I'm going to do. I'm going to go ahead and hear the testimony regarding that case, and I'll make my determination about what weight I give it and what I decide regarding that later. As the parties know, I've been asked to write a report in recommendation to Judge Guaderrama. So I want to get all this evidence on the record, and then I'll make my

determination later. So your objection is overruled, Mr. Hines.

MR. HINES: Your Honor, I would also ask that there be -- that the Court enter some kind of a limiting instruction. I don't want to relitigate Melendez. It's something that's dead. So I would ask that the Court would limit the cross-exam to specific articulable impeachment factors as they pertain to this case, and that we wouldn't have to go through Melendez wholesale again.

THE COURT: I agree with that. This is Judge Schydlower's case, not Judge Guaderrama's. Judge Guaderrama's case is the one that is the Melendez case. So, yeah. I don't want to go into by exactly relitigating the Melendez case. So confine your questions so that we're really focusing on this case. But of course, if you're going to use this to go over the credibility of this witness, go ahead.

MS. BATALLER: Your Honor --

THE COURT: Ms. Bataller, just keep all that in mind.

MS. BATALLER: Yes, I will. Just, do you want to -- and I'll just let him object if he has an issue with it. But I do want to talk about the similarities in the cases through my cross because I think that's the way it makes sense.

THE COURT: Okay. Just, again, don't relitigate --

MS. BATALLER: Right. Right, right.

THE COURT: -- what was already done in that case. Go ahead, Ms. Bataller.

BY MS. BATALLER:

Q In the Melendez case, you made a pretextual stop, correct?

A Yes, ma'am.

Q For a traffic infraction?

A Yes, ma'am.

Q And like in this case, you called a K-9 pretty soon after stopping Mr. Melendez for the traffic infraction, correct?

A Yes, ma'am.

Q And while you were waiting for the K-9, like in this case, you pulled the passenger and the driver out and made them wait for the K-9 to come, correct?

A Yes, ma'am.

Q And you said that there was marijuana residue on the floor of the car and that's why you believed there was a drug crime occurring, correct?

A Yes, ma'am.

Q And in that case, the Court specifically found that was an unreasonable determination, right?

A I didn't know that, ma'am.

Q Okay. No residue was ever recovered in that case?
A Yes, ma'am.
Q It's correct that it was never recovered?
A There were marijuana stems. Yes, ma'am, there was.
Q There was no marijuana residue from the floorboard recovered in that case, correct?
A No, ma'am.
Q And there was no marijuana residue from the floorboard tested in that case, correct?
A It was residue.
Q And you can't test residue?
A It was very, very little, ma'am.
THE COURT: So, Agent, was it tested or not?
THE WITNESS: No, ma'am.
THE COURT: Okay, thank you.
BY MS. BATALLER:
Q And because of that, Judge Guaderrama ultimately found that your unit unreasonably prolonged a traffic stop for a K-9, correct?
A I was unaware, ma'am.
Q After that order came down, then you obviously weren't retrained in Fourth Amendment issues, correct?
A Yes, ma'am.
Q You weren't told by anyone that you can't make up reasonable suspicion after the fact?

MR. HINES: Argumentative, Your Honor.

THE COURT: Sustained.

BY MS. BATALLER:

Q But I want to talk about this case specifically, Mr. Santana Rios' case. You never saw any drugs in the car, correct?

A Yes, ma'am.

Q You never smelled any masking agent in the vehicle, correct?

A I did. Yes, ma'am.

Q What masking agent did you smell?

A The cigarette.

Q Other than that, you didn't smell anything, correct?

A No, ma'am.

Q And as we discussed before, people that are addicted to cigarettes smoke cigarettes, correct?

A Yes, ma'am.

Q Did you smell any detergent?

A No, ma'am.

Q Did you smell any air freshener?

A No, ma'am.

Q And again, you had a lot of testimony about how you believe that these passengers were -- there was testimony about, first of all, the female passenger possibly being a victim, correct?

A Yes, ma'am.
Q At no point in this interaction did you pull her aside and say, hey, are you all right? Are you the victim of something?
A No, ma'am.
Q At no point did you give her any resources for who she can reach out to if she's a victim of human smuggling, correct?
A I called Detective Ray Ucetl (phonetic).
Q Okay. Did he do that for her? Are you aware?
A I believe he did, but I can't speak on behalf of him.
Q These passengers were actually never arrested for this offense, correct?
A Yes, ma'am.
Q And they were allowed to live in the United States because they had permission to do so, correct?
A Yes, ma'am.
Q And every Venezuelan is not part of a gang, correct?
A Yes, ma'am.
Q It's just like our fellow Americans, some of us are, most of us aren't, correct?
A Yes, ma'am.
Q So knowing someone is from a certain country gives you no information about whether they're in a gang or not, right?
A Yes, ma'am.

MS. BATALLER: One moment, please, Your Honor.

THE COURT: Yes.

MS. BATALLER: One moment.

(Whereupon, there was a brief pause in the proceedings.)

BY MS. BATALLER:

Q I just want to go back because I realized when I'm asking you is that correct and you say yes, ma'am, it means you're saying it's correct, right?

A Yes, ma'am.

Q One moment. Oh, I did want to -- I do have one more thing. I apologize. Now, I want to play from Government's Exhibit 1 a moment when Detective Lucero comes. Ray Lucero is his name, correct?

A Yes, ma'am.

Q Now, this is your first chance -- this is the first time he's on scene, correct?

A Yes, ma'am.

Q And it's your first chance to tell him what happened, right?

A Yes, ma'am.

Q Okay. I'm going to start at minute 20:30, which I'll find the timestamp for that. This is 14:46:01.

(Whereupon, the video was played on the record from 3:37 p.m. to 3:38 p.m.)

BY MS. BATALLER:

Q Okay. You testified earlier that Ray Lucero was the guy who's closest connected to Border Patrol, correct?
A Yes, ma'am.
Q And at no point in your body cam video, and especially during that, did you ever mention that you thought human smuggling was going on, correct?
A Yes, ma'am.
Q So that's correct, you never mentioned that, right?
A Yes, ma'am.
Q And at no point did you ever mention that you believed a drug crime was occurring, correct?
A Yes, ma'am.
Q So what you did focus on is the fact that Mr. Santana Rios knew his rights, correct?
A No, ma'am.
Q You did not mention in that conversation that he knew his rights and that he was asking you why you searched his vehicle?
A Can you rephrase that, ma'am?
Q I can replay it and you let me know if you hear when you talk about him knowing his rights and asking why you searched his vehicle. I'll start from 20:30 again, which would be 14:46:01.

(Whereupon, the video was played on the record from 3:39 p.m. to 3:41 p.m.)

BY MS. BATALLER:
Q Did you hear what you just said there? Why are you checking my vehicle? Does that sound right?
A Yes, ma'am.
Q So you're talking about Mr. Santana asking you why are you checking his vehicle, correct?
A Yes, ma'am.
Q It's not illegal to ask why a police officer is checking your vehicle, correct?
A No, ma'am.
Q And it's not illegal to care about your Fourth Amendment rights and want them to be protected, is it?
A No, ma'am.
Q Nowhere in this whole body cam video do you ever mention a drug crime or human smuggling, correct?
A Not to Detective Lucero. No, ma'am.
Q Okay. But nowhere in the entire body cam video do you discuss that, correct?
A No, ma'am.
Q And you testified on direct that your body cam is your best record, correct?
A Yes, ma'am.
Q Because you didn't write a report?
A Yes, ma'am.
MS. BATALLER: Nothing further.

THE COURT: Okay. Mr. Hines, any other questions?

MR. HINES: Very brief redirect with the Court's permission.

THE COURT: Go ahead.

REDIRECT EXAMINATION

BY MR. HINES:

Q All right, Officer. Let's start with your most recent testimony and work back real quick. Detective Lucero conversation, you didn't say anything about smuggling persons or drugs, correct?

A Yes, sir.

Q Why didn't you say anything about smuggling persons or drugs at that point?

A Because I didn't want to sway his opinion of what was going on.

Q Okay. Do you have time to investigate firearms crimes?

A Yes, ma'am. Yes, sir.

Q Okay. And what type of firearms crimes do you normally investigate?

A Unlawful carrying of weapons.

Q Okay. Are you aware of any other firearms crimes that are a violation of Texas Code that you could have investigated in this instance?

A Felons in possession of firearms.

Q Okay. Is it a crime to smuggle a firearm in the state

of Texas?
A Yes, sir.
Q Is that a crime that you could have investigated?
A Yes, sir.
Q Okay. I want to take a step back now. When you first seized or detained the Defendant in this case, why did you seize and detain him?
A Because of a traffic violation that occurred in my presence.
Q Okay. And when you moved him out of the car and onto the rocks, why were you detaining him?
A Because I believed that there was another investigation that needed to occur, which was the illegal narcotics and the human smuggling.
Q Okay. And once the gun was found, why were you detaining him?
A At that point in time, I needed to make sure that it wasn't stolen or we didn't find any narcotics inside that vehicle.
Q Okay. Is the crime that you pulled this Defendant over for an offense that a person can be arrested for in the State of Texas?
A Can you rephrase that, sir?
Q Uh-huh. The Class C traffic offense that you pulled this Defendant over for?

A Oh, yes, sir.
Q Is that a crime that someone can be arrested for in the state of Texas?
A Yes, sir.
Q What gives you the authority to make an arrest for such a traffic offense?
A It's going to be in our Code of Criminal Procedure. It's 14.01. It should be Section B.
Q Okay. And so what was this defendant ultimately arrested for?
A It's going to be the traffic violation, the 454.104. And that's going to be the fail to signal left turn.
Q Okay. And at one point on cross-exam, you testified that you didn't let the defendant and the other two individuals leave the area that was in the sun, right?
A Yes, sir.
Q Why didn't you let them leave that area?
A At that point in time, they were detained.
Q Right. But why not move them? Was there a reason you kept them where you had them?
A Yes, sir.
Q What was the reason?
A Meaning keeping them together or?
Q Why keep them on the rocks and not put them somewhere else?

A Well, at that point in time, I don't want them getting closer to the vehicle.
Q Okay.
A I want them away from the vehicle. I have already separated them in the vehicle. I don't want them re-entering that vehicle.
Q Okay. And you did turn your body camera off at one point, correct?
A Yes, sir.
Q Why?
A At that point in time, I stepped away, not interacting with any of the subjects, talking to my lieutenant about the situation that we had.
Q And what did you say?
A Pretty much just telling him that that's what we had. I didn't know if a violation had occurred. I don't know --
MS. BATALLER: Objection, Your Honor. This is hearsay. We don't have a video --
MR. HINES: Your Honor, they've opened the door by suggesting something nefarious happened during the time that the camera was turned off.
THE COURT: Well, I'll say this. Hearsay, I mean, the rules of evidence don't apply with the same force in suppression hearings. And I'm going to hear what she has to say. So that is overruled.

THE WITNESS: At that point in time, I'm advising my lieutenant pretty much what we had. I know we have resources at the place that we work at the TAG where he can ask the opinions of other agencies. And at that point in time, I told him that I was going to make that determination to place him under arrest for the moving violation, which was the fail to signal.

BY MR. HINES:

Q Okay. And you talked about resources that are available to you at the TAG, right?

A Yes, sir.

Q Okay. That kind of reminds me, and I want to ask a question here. You testified that you worked at the Westside TAC or the Westside regular command, I forget.

A Yes, sir. Westside Regional Command.

Q Okay. And in the course of that, did you handle violent crimes involving victims?

A Yes, sir.

Q Did you handle crimes involving what you suspected would have been commonly referred to under Texas law as assault family violence, or in common speech, domestic violence?

A Yes, sir.

Q Crimes where there's female victims?

A Yes, sir.

Q When you would work those sort of crimes, do you talk to

them about what's going on or offer to help them in front of who you believe is committing the crime?

A No, sir. Absolutely not.

Q Why not?

A At that point in time, I don't want them to be coached and what to say. I don't want to scare them. I don't want to make the offender or the male subject at that time aware of what's going on. So we have to apprehend with that when speaking to the victim so they feel safe.

Q Okay. So what was your mindset then when interacting with the female in this case?

A At that point in time, I knew that he would get better help with Detective Lucero who works hand-in-hand with Venezuelans in particular if not on a daily basis, then a weekly basis.

Q Okay. So the fact that you didn't ask her about her safety, does that indicate that you weren't concerned about her safety?

A No. I was still concerned about her safety, sir.

Q So then why not ask her about her safety at that point?

A I didn't ask her I didn't want to make Mr. Rios or anybody else feel like I had some sort of suspicion at that point in time. I didn't want him to start looking at her or start telling her not to say anything.

Q Okay. And when you're talking with Detective Lucero,

you don't mention your original suspicions about narcotics or alien smuggling?
A Yes, sir.
Q Okay. Why didn't you mention them at that point?
A Because at that point, he wasn't there to assist me with the narcotics. He was there to assist me with the Spanish speaking, first and foremost, and then helping me obtain positive identification from the two Venezuelans.
MR. HINES: Pass the witness, Your Honor.
THE COURT: Ms. Bataller?

RECROSS-EXAMINATION

BY MS. BATALLER:
Q There was plenty of space for you to take the female Venezuelan aside, correct?
A Yes, ma'am.
Q And there were three officers on the scene at one point, four women, and Detective Lucero came, correct?
A Yes, ma'am.
Q And so you would have had plenty of manpower to pull her aside as well, correct?
A Not at that point in time, ma'am.
Q Okay. You also can't testify that Mr. Rios would have said to her, would have threatened her in any way, correct?
A I don't know that. Yes, ma'am. I don't know that.
Q Okay. Because at this point, the only information that

you have that she's a victim is that she's Venezuelan?
A No, ma'am.
Q What is the other information that you have that suggests she's a victim of trafficking?
A She's also not speaking. She's not making eye contact with me. She's not answering any questions.
Q When you ask her her date of birth, she talks quite a bit, right?
A Yes, ma'am.
Q And that would have been a time at which you could have pulled her aside under the guise of having to check her birth date, correct?
A Yes, ma'am.
Q And you didn't do that, right?
A Yes, ma'am.
Q You don't normally arrest people for traffic infractions, right?
A Not necessarily, ma'am.
Q You don't normally do that, though, right?
A But I have, several times.
Q You have several times. But when someone solely commits a traffic violation and you pull them over, you arrest them for that traffic violation. or do you give them a ticket? What do you typically do?
A Typically a warning or a traffic citation.

Q And that's much more common than arresting someone if that's all you have as a traffic violation, correct?
A Yes, ma'am.
Q In fact, your fellow officers might look at you weird if you arrest someone for a traffic infraction and nothing else, correct?
A No, ma'am.
Q That wouldn't be strange at all. So I'm speeding down the road and you arrest me for speeding. It wouldn't be strange at all to later find me in jail? The officers wouldn't find that strange?
A No, ma'am.
Q And even if you stop someone for a traffic offense, you're still trained that you have to have reasonable suspicion to continue that stop beyond the normal amount of time for a traffic stop, correct?
A Yes, ma'am.
Q So you still have to follow the Fourth Amendment, correct?
A Yes, ma'am.
MS. BATALLER: Nothing further.
THE COURT: Mr. Hines, any other questions?
MR. HINES: One.
THE COURT: Okay. Go ahead.
MR. HINES: Thank you, Your Honor.

FURTHER REDIRECT EXAMINATION

BY MR. HINES:

Q Defendant Counsel asked you if your officers would think that it was weird that you arrested someone on a traffic offense, correct?

A Yes, sir.

Q Okay. So --

MR. HINES: And I apologize, Your Honor. It's going to be two because I just said correct.

BY MR. HINES:

Q Would your fellow officers think it weird if you hadn't arrested an alien to the United States who had an assault rifle in his vehicle?

A Yes, sir.

MR. HINES: No further questions, Your Honor.

THE COURT: Ms. Bataller, any other questions?

MS. BATALLER: Nothing further, Your Honor.

THE COURT: All right. I do have a couple of questions, Officer Gonzalez. Let's see.

EXAMINATION

BY THE COURT:

Q So when you were talking about the MCT checks, did you know what that meant?

A Yes, ma'am. That's running subjects through our computer that's inside our police unit.

Q Do you know what it stands for?
A No, ma'am. Actually I don't.
Q And when you were talking about the word Vice, watching the video, what were you referring to?
A Can you repeat that? I'm sorry, ma'am.
Q When you were talking about using the word Vice earlier in your testimony, what were you referring to?
A I didn't say Vice.
Q Okay. I misunderstood that. So at what point did you run Mr. Rios' ID?
A That's going to be as soon as I get them out of the vehicle and I start running the subjects. It's going to be when I'm by my unit.
Q Okay. And his came back right away as being fine?
A No, ma'am. I was going to run him through our communications. I ran him through my radio.
Q Okay. So explain that. I'm a little confused. So you ran it twice then?
A No, ma'am. So I ran -- I tried running the Venezuelans through my communications through my computer with the information that they provided and at which point in time, nothing came back. I got no return.
Q All right.
A So at that point in time, I went to regular, it's called our information channel and that's communications. That's

where I ran all three subjects.
Q Okay. And did you run Mr. Rios in your computer?
A No, ma'am.
Q Why was that?
A I was going to go through our communications. That's a little bit more accurate, especially since it's out of state. A lot of the times we won't get an alert or a hit. We call it a hit if it's not from Texas.
Q Okay.
A So just to better verify.
Q Now, so when you were testifying about the vehicle making that left turn into the Valero, you said that the windows had originally been down. Is that right? Were all the windows, all four were down?
A The ones that I could observe on my driver's side were up at that time.
Q Oh, they were up?
A They were up. Yes, ma'am.
Q and --
A Oh, I'm sorry. They were down -- when I was going to conduct the traffic stop, they were down.
Q The driver and the passenger in the back, their windows were down?
A Yes, ma'am.
Q And then when you -- the vehicle stops there at the

Valero, all of a sudden you see that the windows are up?
A They start getting rolled up. Yes, ma'am.
Q Okay. All right. So the reason you pull this vehicle over is because he fails to turn on his left turn signal. Is that right?
A Yes, ma'am.
Q So the other stuff about being -- coming out of the Motel 6 and either he's waiting there a long time, that's not really the reason you stop him, right?
A No, ma'am. That gave me reasonable suspicion, but that is not the reason why I pulled him over.
Q It gave you reasonable suspicion to do what?
A To see -- to want to investigate more, to see who was in the vehicle. But that was not what gave me probable cause to pull the vehicle over.
Q Okay. And so I think it's Detective Lucero, who does he work for again?
A He's out of the gang unit.
Q Okay. And he doesn't work for Border Patrol, but he talks to Border Patrol every week or every day in his role?
A Yes, ma'am. We have a -- like, literally next to his cubby -- we work with different agencies within the Texas Anti-Gang Center off of Boeing. And we have HSI, FBI, DEA, we have all these different agencies. And within that section, we have Border Patrol -- an agent from Border Patrol

that's assigned to us, and that's going to be Agent Freddy.

And so him and Detective Ray Lucero go to (indiscernible) meetings. They're the ones that go and deal with mostly the TPA, the Venezuelans, if not on a daily basis, on at least a weekly basis.

Q So his name is Freddy, the Border Patrol agent is Freddy what?

A I don't recall his last name. I just -- I just call him Freddy.

Q And why did you not call Freddy instead of Detective Lucero?

A I didn't have his phone number. So I called Detective Lucero because he's in my unit.

Q And you knew that he worked closely with Freddy and that he would -- Freddy then would check?

A Yes, because I had seen Freddy at shift waiting that day. So I knew he was in the office.

Q And so the checks that you do for the immigration status for the two passengers, the Venezuelans, all that is verified. You get that information through Detective Lucero?

A Through Detective Lucero and the agent from Border Patrol, Freddy. Yes, ma'am.

Q Okay. That's how you find out that they are in fact here legally?

A Yes, ma'am.

Q And that they're from Venezuela, you verify that?
A Yes, ma'am.
Q All right. So why -- when the vehicle stops, you have then roll down the windows. Why do you almost immediately call the K-9? I just want to be clear about this.
A At that point in time, that's when I had to ask them where they're from. Just totality of everything, the location from where they were coming from, the fact that the passenger, I've had several arrests where the back left passenger stuck out his window -- stuck out his head out of the window and there were three guns in that vehicle. So due to past previous arrests and trainings, that right away caught my attention.
The fact that two people did not have proper documentation inside the vehicle, the fact that the cigarette was being lit up at that point in time, that's pretty -- the luggage, I know that narcotics can be concealed inside bags. So just due to all of that, that's when I knew that I wanted to further investigate and I called Officer McKenzie.
Q But you knew that you had to go through your checks and not detain these individuals any longer than necessary. Is that right?
A Can you repeat that, ma'am?
Q You knew that you couldn't detain these people any longer than necessary to make the ID checks and checks for

warrants and things like that.
A Yes, ma'am. I knew that. If that dog had not alerted, I understood that I could not get in that car. I knew he was going to give me consent, so I did know that there had to be proper checks and balances going on during that traffic stop.
Q Okay. So you said that basically the dog gave you consent if it alerted to detain them longer. Is that what you're saying?
A During that time -- well, I want to make sure that first and foremost that they are here legally, especially if we have those resources. So, yes, ma'am, I wanted to make sure that no human smuggling was going on. I needed Officer McKenzie to continue his narcotics investigation. And then if everything had checked out, they would have been sent on their way.
Q Okay. But I guess my question to you is you -- because you had not called in the checks for these individuals yet when you called a K-9. So your understanding is that if the dog had alerted, that would allow you to detain the individuals longer. Is that your understanding?
A No. No, ma'am.
Q Okay.
A I knew at that point in time I had to further investigate. But I was going to continue doing my investigation of, first and foremost, the traffic stop. And

then everything else, the possible human smuggling, the possible illegal narcotics inside the vehicle. So I'm doing my -- I'm continuing to do my investigation. But within that time, I know I could call Officer McKenzie to come and assist.

Q And why did it take so long to do the records checks for these individuals, I guess?

A I wanted to separate them from that point in time from the vehicle, ma'am. I wanted to make sure -- I don't -- at this point in time, I don't know what's inside the vehicle. So I don't want to turn my back or have my partner turn my back without me making sure that vehicle is safe. I want to separate them first and give them some distance from that vehicle. So more for officer safety, ma'am.

Q All right. Now, also, why were the doors -- when they were removed from the vehicle, why were the doors to the vehicle left open?

A I believe they left them like that.

Q Who left them like that?

A The occupants exiting the vehicles.

Q Okay. All right. And so your understanding is that there was an alert by the K-9. Is that right?

A I can't speak on behalf of the K-9, ma'am.

Q All right. Okay. And you turned off your body cam because you were speaking to the lieutenant about the case?

A Yes, ma'am.
Q Did you turn it back on again afterwards?
A Yes, ma'am.
Q So, officer, what was the reason for doing the pat-down of the three subjects?
A For weapons, ma'am.
Q Okay. Is that that they might be armed and dangerous?
A I do it with every stop whenever -- correction, not with every stop. Every time I take a subject out of the vehicle, I always pat down, ma'am.
Q And that's because you think they might be armed and dangerous, or what's the reason?
A I don't know who that person is at that point in time, and so I want to make sure that they don't have any firearms on them that could hurt myself or my partner.
Q All right. And was Mr. Rios ever asked why he didn't use his turn signal?
A Yes. Well, when I was explaining to him the reason for his traffic stop, that's when he acknowledges, he turns back at the signal that was broken, and he says something to the effect of oh, it's broken or it's damaged, and that's why it wasn't working. And I said okay, well that's defective equipment. And he goes -- and he nods his head up and down as if he acknowledged the reason for the traffic stop.
Q Okay. Is there another ticket available to charge

someone with a defective equipment?

A Defective equipment.

Q Okay. But you didn't charge him with that, right?

A No, ma'am.

Q All right. So at some point you find out that Mr. Rios is here illegally, is that right?

A That's after the -- that is not the time I'm out there with him. That is later when he's already placed under arrest for that moving -- for the traffic violation.

THE COURT: Okay. I'm going to take a brief recess. We'll be at recess.

THE CLERK: All rise. Court is in recess.

(Whereupon, at 4:04 p.m., a brief recess was taken.)

(Whereupon, at 4:21 p.m., the proceedings reconvened.)

THE CLERK: All rise. Magistrate court is back in session.

THE COURT: Please be seated. So we're back on the record in the suppression hearing. We have Officer Gonzalez on the stand. There's one thing I want to clarify for the record so we can have this. Is the timestamp as to when you ran the Defendant's identification -- Mr. Hines, would you be able to do that?

MR. HINES: Yes, Your Honor. If I could approach the lectern.

THE COURT: Yes, go ahead.

MR. HINES: I'll pull it up.

THE COURT: All right.

MS. BATALLER: I think it's at minute 10, around minute 10.

MR. HINES: All right. Your Honor, I'm opening United States Exhibit Number 1.

THE COURT: Okay.

MR. HINES: And I'm going to put it up on the screen.

THE COURT: Okay. And Officer Gonzalez, is that when you -- no that's not when you -- well, that's when you were just getting there, right?

MR. HINES: Yes, Your Honor.

(Whereupon, the video was played briefly on the record at 4:23 p.m.)

THE COURT: Okay. We're looking for the one for the Defendant. Not the --

MR. HINES: I'm sorry, Your Honor. I'm at 14:35:41 on the timestamp that's visible on the video. And I'm going to play it from that point.

(Whereupon, the video was played briefly on the record at 4:23 p.m.)

THE COURT: You can stop right there, Mr. Hines.

MR. HINES: Your Honor, I've stopped the video at 14:36:02.

THE COURT: So, Officer Gonzalez, is this more or less around the time that you're getting -- you're running the Defendant's ID through the radio?

THE WITNESS: Yes, ma'am.

THE COURT: All right. Thank you.

Thank you, Mr. Hines. All right. So, may this witness, Officer Gonzalez, be permanently excused, Mr. Hines?

MR. HINES: Your Honor, based off of just this, I am confused and I would like to clarify something, with the Court's permission. But I think I would need her to do that. So, I don't know if I want to be able to recall her or whether I could ask her another question right now.

THE COURT: Okay. Any objection to having Mr. Hines ask her some additional questions at this point, Ms. Bataller?

MS. BATALLER: Your Honor, to be honest, I don't know why that would be appropriate. I think he's already done his direct redirect. And I don't see why it would be appropriate, unless it's clarifying.

MR. HINES: It's clarifying this specific issue.

THE COURT: All right.

MS. BATALLER: Then I don't think I have an objection to that.

THE COURT: Can you be a little clearer, Ms. Bataller? We can't hear you.

MS. BATALLER: Then I don't have no objection to that, Your Honor.

THE COURT: No objection? Okay.

MS. BATALLER: (Indiscernible) follow-up on this.

THE COURT: All right. Go ahead, Mr. Hines.

MR. HINES: Thank you so much, Your Honor.

FURTHER REDIRECT EXAMINATION

BY MR. HINES:

Q Okay. Officer, right here, you're typing stuff into a computer, correct?

A Yes, sir.

Q And the timestamp is 14:36:02?

A Yes, sir.

Q Okay. And earlier, when the Judge was asking you a question, you said that there's a point where you stopped and you exit the vehicle and you call on the radio to get better information.

A Yes, sir.

Q And we're going to forward and try to find that location.

(Whereupon, the video was played briefly on the record at 4:25 p.m.)

BY MR. HINES:

Q Okay. At this point it's, again, 14:36:51. You've exited the vehicle. What are you going to do here?

A This is when I go up to her and I just try to verify her name and date of birth. Well, right here, I'm asking for her (In Spanish), date of birth.

Q Okay. And did the radio occur before this, or is it after this at a point in the future still?

A It's after this.

Q Let's forward until we can find that.

(Whereupon, the video was played briefly on the record at 4:26 p.m.)

MS. BATALLER: That's at 14:26.

MR. HINES: 14?

THE COURT: Okay. Ms. Bataller, I will ask you, do not speak to Counsel. Do you have an objection?

MS. BATALLER: I don't have an objection, Your Honor.

THE COURT: And if you can stand and address the Court.

MS. BATALLER: Yes, Your Honor. I apologize. It's at 14:26 where she starts to call I think it's Detective Lucero or somebody about the immigration documents.

THE COURT: All right. Thank you.

(Whereupon, the video was played briefly on the record at 4:26 p.m.)

BY MR. HINES:

Q Okay. Right here, it is 14:37:31. What did you just

say?
A I'm going to go to Channel 1, which is our EPPD communications.
Q And is this what you're referring to when the Judge asked you if you began radio?
A Yes, sir.
Q Okay. And the timestamp there is 14:37:31?
A Yes, sir.
(Whereupon, the video was played briefly on the record at 4:27 p.m.)
MR. HINES: That was it, Your Honor. I just wanted to make sure the time when she began the radio transmissions was on the record, as well.
THE COURT: Okay. Thank you, Mr. Hines.
MR. HINES: Thank you, Your Honor.
THE COURT: Ms. Bataller, do you want to clarify anything else regarding these transmissions?
MS. BATALLER: Just very briefly, Your Honor.
THE COURT: Go ahead.

FURTHER RECROSS-EXAMINATION

BY MS. BATALLER:
Q I just want to -- I'm going to play the video starting at minute 14:26. When you first initially opened up the radio, as you said, or were going to make contact, it took a while to get in contact with somebody, correct?

A Yes, ma'am.

Q You didn't start speaking to someone until about minute 1426. Does that sound right?

A I don't recall the time, but it does take a little bit usually. Yes, ma'am.

Q Okay. So I'm going to try to play that and see if we can see that.

(Whereupon, the video was played briefly on the record at 4:28 p.m.)

BY MS. BATALLER:

Q And that's at 14:40:05. And at that point, you're speaking to someone about these immigrants' information, correct?

A Yes, ma'am.

MS. BATALLER: Okay. Nothing further.

THE COURT: Mr. Hines, anything else?

MR. HINES: No, Your Honor. And I appreciate the Court indulging us and allowing us to clarify the radio call.

THE COURT: All right. Thank you.

And so, again, just one more clarification, Officer Gonzalez. So basically, you were trying to do computer checks that didn't work out. That's when you went to the radio and did all three checks on the radio. Or you were trying to do all three checks on the radio, is that right?

THE WITNESS: Yes, ma'am.

THE COURT: And you got the check for Mr. Rios on the radio?

THE WITNESS: Yes, ma'am.

THE COURT: All right. Thank you. Again, so may Officer Gonzalez be permanently excused, Mr. Hines?

MR. HINES: No objections from the United States, Your Honor.

THE COURT: And Ms. Bataller?

MS. BATALLER: No objections, Your Honor.

THE COURT: All right. So, Officer Gonzalez, you may be excused.

THE WITNESS: Thank you.

THE COURT: All right. Thank you.

(Whereupon, the witness was excused.)

MR. HINES: Your Honor, since the rule has been invoked, can I close the current exhibit before the next witness comes in?

THE COURT: Yes, please. Thank you. All right. Mr. Hines, if you'll call your next witness.

MR. HINES: Your Honor, with the Court's permission, the United States would like to call Officer Ryan McKenzie of the El Paso Police Department.

THE COURT: All right. Thank you. Officer McKenzie, I swore you in earlier, is that right?

MR. McKENZIE: Yes, Your Honor.

MR. MCKENZIE: Yes, Your Honor.

THE COURT: Okay. You're still under oath. Please have a seat. All right. Thank you.

MR. McKENZIE: Thank you.

THE COURT: Go ahead, Mr. Hines.

RYAN MCKENZIE, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. HINES:

Q Officer McKenzie, can you go ahead and state your name, spell it, and your occupation for the purposes of the record, please?

A Yes, sir. My name is Ryan David McKenzie, R-Y-A-N D-A-V-I-D M-C-K-E-N-Z-I-E. I'm currently employed as a police officer with the El Paso Police Department.

Q And, Officer, I know you're a soft-spoken individual, so everything here is being recorded. Feel free to move the mic to get it close to your mouth so you're able to speak loudly.

A Yes, sir.

Q Okay. How long have you been employed by El Paso Police Department?

A Since January 22nd.

Q Of what year?

A 2018. Nearly seven years.

Q How many years?

A Nearly seven.

Q Okay.
A Seven in January, sir.
Q What are your current duties with the El Paso Police Department?
A work for the Gang Unit, running a narcotics detection dog.
Q Okay. And how long have you been doing that?
A For the last year and a half.
Q Okay. Prior to that, what did you do while you were on the force?
A I worked at Pebble Hills TAC, which is plainclothes investigations, as well as patrol at Pebble Hills.
Q Okay. And, obviously, you took some sort of a class or training in order to be certified as a peace officer?
A Yes, sir.
Q And are you current on all your certifications?
A Yes, sir.
Q Okay. In addition to classes and training on being a peace officer in general, have you received special training in your current position as a dog handler?
A Yes, sir, I have.
Q And what did that entail?
A It was the El Paso Police Department's Police Service Dog Academy, which was six weeks. As well as prior to that, I have more formal training in dog handling, sir.

Q Okay. What do you mean when you say prior to that you have more formal training in dog handling?
A While I was on active duty in the United States Army, I was a specialized search dog handler. I went through military basic handler's course as a dog handler and then the advanced course of specialized search dog handler school.
Q Okay. And in the military, were you running narcotics dogs?
A I was not.
Q What type of dogs were you running?
A They were explosive detection.
Q So what would those dogs you ran in the military, how were they trained to alert and what would they alert to?
A They were passive alerts, and they would alert to explosive material.
Q Okay. Would they alert to the visual presence of explosive material? Would they alert to the odor of explosive material?
A The odor of explosive, sir.
Q Okay. So in function and form, a separate odor trained to alert for, but still visually you're looking for the same signs on a passive alert?
A Yes, sir.
Q What is a passive alert?
A A passive alert is a change in body posture as well as

an increased respiration when the dog first initially encounters the odors that he's been -- he or she has been trained to detect.

Q Okay. What does that look like to someone who has not been trained to see that?

A The dog will show some sort of change of behavior, either a head tilt, head turn. They may pull and then they're going to -- or jump or go low with their nose to get more odor into their nose. And they will also start breathing heavier or harder, stronger through the nose to smell it.

Q Okay. And that's what is called a passive alert?

A Yes, sir.

Q What is an active alert?

A An active alert would be like an aggressive indication, a bark, a bite, a scratch.

Q Okay. And that's generally what a layman who doesn't know what a dog that's trained to alert to an odor would do, like that's what you would see on television or the movies, potentially?

A Potentially, sir.

Q Okay. How many hours did you have running dogs in the military?

A Five years, sir.

Q So in that five years, were you doing it nearly every

day, every single day?
A Nearly every single day, yes, sir.
Q Okay. And was it training of the dogs or was it deploying them and watching for passive or active alerts?
A Both, sir.
Q Okay. In your military experience watching dogs, how many times have you seen a dog do a passive alert? Five hundred?
A Way higher, sir.
Q Thousand?
A More.
Q Two or three thousand?
A More than that because there's many dogs in the kennel at one time and we were all trained together. So you're talking maybe 15 dogs a day that after training, whether it's explosives or narcotics dogs, and they're all passive alerts.
Q Okay. So suffice it to say, you've seen a dog do a passive alert a lot?
A Yes, sir.
Q It's something that you've been very present and familiar with your prior military experience and with how long in the police department?
A The last year and a half with the police department, yes, sir.
Q Okay. Now, a passive alert, is that something that a

bystander can see or is that something that a handler and a trainer have to together be in tandem attuned to?

A The handler would be the best to be able to read that specific dog.

Q Why?

A Because that's the person that's been training with that dog and that is their main duty. That's their job is to be able to read that dog.

Q Okay. And you said that you have training from the El Paso Police Department in narcotics dog handling?

A That's correct, yes, sir.

Q And is that training for you specifically as a handler?

A Me specifically and the dog, sir.

Q Okay.

A The dog team.

Q Do you complete the training at El Paso with the El Paso Police Department? I guess what I'm trying to ask is, is there a course that you do by yourself and then you're assigned a dog or do you do the whole program with a dog?

A You conduct the academy with the dog, sir.

Q Okay. Do you currently have a K-9 partner?

A I do, sir.

Q What's your K-9 partner's name? K-9 Leica, sir.

Q Okay. And how old is K-9 Leica?

A She's a two-year-old.

Q And you said she's a she, so I'm assuming it's a female dog?
A Yes, sir.
Q What breed is she?
A She is a Belgian Malinois.
Q And do you know where she came from?
A Yes, sir.
Q Where did she come from?
A She was purchased from the Netherlands by Adler Horse K-9 --
Q Okay.
A -- from Juniper, California.
Q Okay. And was she bred with the specific purpose of being a K-9 alert dog or a dog handling dog?
A A working dog, yes, sir.
Q Okay. And when you say working dog, is that specific to a dog that's trained in the odor of narcotics or could it be a dog trained for something else?
A You could train a dog for other odors.
Q Like, I guess my question would be, Leica was bought with the intent of becoming a dog that's trained to alert to the presence of a specific odor or was she bought to be a dog that would be like a deterrence dog for riot control or something of that nature?
A No, she was specifically purchased for detection

purposes.
Q Okay. And that's her bloodlines and her training -- or sorry, that's her bloodlines and her pedigree was that that dog was bred for that purpose?
A That's correct, yes, sir.
Q Okay. And at what point did you receive your pairing with Leica?
A We started the El Paso Police Service Dog Academy in the -- June of 2023.
Q Okay. And what does that Service Dog Academy entail and how are you certified?
A That academy is a rigorous course of training yourself as well as the dog through the trainers at the department five days a week. And then care for your dog seven days a week and for six weeks, sir.
Q Okay. And is there a governing body that oversees the implementation and standards of the training that El Paso Police Department uses?
A Yes, sir.
Q What is that governing body?
A The National Narcotics Detector Dog Association.
Q And what do they -- do they offer certification standards as well?
A Yes, sir.
Q So are you certified by them in addition to the El Paso

Police Department?
A Yes, sir. Leica and I are certified.
Q So you're certified by both the El Paso Police Department and the -- what was the group you just called?
A NNDDA, National Narcotics Detector Dog Association.
Q Okay.
A Yes, sir.
Q And is that dog an industry standard dog group, an industry standard group that is used to regulate the training and implementation and deploying of dogs like Leica?
A Yes, sir.
Q Is it the same set of criteria to regulate and implement the deploying of handlers such as yourself?
A Yes, sir.
Q Okay. How often do you have to be certified by this national group?
A Annually, sir.
Q Okay. Is there training in between that?
A Yes, sir.
Q And have you been doing that training?
A Yes, sir.
Q Are you currently certified by this organization?
A Yes, sir.
Q And are you current on your, in between continuing education or continuing processes?

A We refer to it as maintenance training, but yes, sir.
Q Okay. And what is requirements of those maintenance training?
A Generally speaking, it's every other week, but it's four hours at a time. Eight hours of detection training is required monthly.
Q Okay. And so all in all, how much time have you and Leica spent together doing detection training?
A Since June of 2023, we've been together every day, sir.
Q Okay. And every day you do at least how many hours of training?
A Every other week we'll do -- generally speaking, every other week we'll do four hours of detection training. So 52 -- 52 weeks in a year.
Q We're talking hundreds of hours?
A Yes, sir.
Q Okay. And on August 7th of 2024, were both you and Leica current and certified in all of the requirements of the agency that you described?
A Yes, sir.
Q Are they current and certified by the El Paso Police Department?
A Yes, sir.
Q Okay. And were you guys on duty that day?
A Yes, sir.

Q And were you wearing a body-worn camera?
A Yes, sir. And have you -- actually, let me take a moment here.
Okay. Let's go back to the training. Are there any particular orders that Leica is trained to alert for?
A Yes, sir.
Q What are they?
A Marijuana, cocaine, methamphetamine, MDMA, and heroin.
Q Okay. And earlier you had talked about dogs doing passive versus active alerts. How does Leica alert?
A She is trained for a passive alert, sir. Okay. And have you deployed her to the field before?
A Yes, sir.
Q And have you, in the course of training, seen her do passive alerts as well?
A Yes, sir.
Q Okay. And what does Leica's passive alert look like?
A Each -- each alert will not look identical, sir. But she's going to have some sort of change in body posture as well as increased respiration.
Q Okay. And how do you know when she's actually giving you an alert? What is it that triggers you that's like something has just changed here?
A Paying close attention to her and knowing her better than anybody else, sir.

Q Okay. And is that based off of what?
A Our training together, sir.
Q Okay. What you said was hundreds of hours?
A Yes, sir.
Q Okay. So let's go back then to August 7th of 2024. You were wearing a body-worn camera?
A Yes, sir.
Q And before work that day, before you left for that shift, did you determine whether or not your camera was functional?
A Yes, sir.
Q What shift were you working, do you recall?
A I believe we worked during the day.
Q Okay. And did you deploy your body-worn camera at any point on August 7th of 2024?
A Yes, sir.
Q After you deployed your body-worn camera, what did you do with the footage that you obtained from it?
A I dock it at the docking station to upload the videos.
Q Okay. And have you reviewed what's been marked here as United States Exhibit Number 2, or Government Exhibit Number 2?
A Yes, sir.
Q Have you reviewed this video?
A If that's the video from my body-worn camera, yes, sir.

Q Okay. And has it been altered in any way?
A No, sir.
Q Has it been changed from what you saw or captured the day that you recorded and uploaded it?
A No, sir.
Q Okay. And is it a fair and accurate depiction of the things you saw and heard that day?
A Yes, sir.

MR. HINES: Your Honor, I move to admit United States Exhibit Number 2, which is this agent's body-worn camera.

THE COURT: Any objections, Ms. Bataller?

MS. BATALLER: No objection, Your Honor.

THE COURT: Then Government's Exhibit Number 2 will be admitted.

(Whereupon, Government's Exhibit Number 2 was admitted into evidence.)

MR. HINES: Your Honor, I'd like to publish Government Exhibit Number 2.

THE COURT: Go ahead.

MR. HINES: And again, for the purposes of the record, the timestamp that I'll be narrating when I pause or start will be the timestamp on the video itself in the top right-hand corner, which would be the time of day the recording is occurring.

(Whereupon, the video was played on the record at 4:45 p.m.)

BY MR. HINES:

Q Okay. I've paused it at 14:30:59. What are we looking at here?

A That's a police car having pulled somebody over in a parking lot near Lomaland and Gateway West.

Q Okay. And how did you end up at this location?

A I was requested by the officers conducting the traffic stop, sir.

Q Okay. And were you out on patrol that day or were you sitting somewhere waiting for a call?

A I was in the area with them. I wasn't actively doing anything at the moment, just waiting for them -- anybody to call and ask for a dog.

Q Okay. And why are you out in this specific area?

A That specific area is a very high crime rate area.

Q Okay. How do you know it to be a high crime rate area?

A I've been part of numerous arrests in that area and conducted numerous investigations in that area.

Q Okay. What type of arrests have you conducted in that area?

A Narcotics, family violence, assaults, numerous --

Q And what type of investigations have you investigated?

A Burglaries of vehicles and of the motel rooms that are

directly next to and behind or north of that parking lot, as well as aggravated robberies of that convenience store.

Q Of which convenience store?

A The one pictured, sir.

Q Then we're looking at the back of the convenience store?

A Yes, sir.

MR. HINES: Okay. Continue the video.

(Whereupon, the video was played on the record at 4:47 p.m.)

MR. HINES: I'm going to pause the video here at 14:31:10.

BY MR. HINES:

Q Who's the officer that we see here in the sunglasses and the blue gloves?

A Officer Sabrina Gonzalez.

Q Okay. And how do you know who Officer Sabrina Gonzalez is?

A She's a classmate of mine from the police academy as well as we both work in the Gang Unit, sir.

Q Okay. And is she the one that called you?

A It was either her or her partner. I don't remember which.

Q Okay. And did you receive that call over the radio or did you get a phone call? Like how did you get communicated?

A It was over the police radio, sir.

Q Okay.

(Whereupon, the video was played on the record at 4:48 p.m.)

BY MR. HINES:

Q Now what are you doing here? I've stopped the video at 14:31:18. What are you doing here?

A Conducting a pre-sniff ritual of checking the vehicle for any hazards, sir.

Q Okay. And is this something you do every time you search a vehicle?

A Prior to sniffs, yes, sir.

Q Okay. And I apologize. You're right. Prior to doing a sniff.

A Yes, sir.

Q So what's the difference -- for the purpose of the record, what's the difference between a sniff and a search?

A A sniff is not -- not considered a search, sir. A sniff is of the exterior of the vehicle for sniffing for odor of narcotics.

Q Okay. And what do you need in order to do a sniff? Do you need permission?

A No, sir.

Q Do you need to have reasonable suspicion?

A No, sir.

Q Do you need to have probable cause?

A No, sir.

Q How many sniffs have you conducted at a traffic stop?

A Roughly 250.

Q Okay. And what is the main limitation that you're concerned about when you show up at a traffic stop? Do you have all day to be able to run the sniff?

A My -- my biggest concern is getting there in a timely fashion.

Q And why do you need to be there in a timely fashion?

A Because we can't extend a traffic stop based solely on -- we can't extend a traffic stop to accompany for me to get there past the time it would take for a traffic stop.

Q Right.

MS. BATALLER: Your Honor, I'm going to object to his recitation of what the law is. He's not an expert on legal issues.

THE COURT: I'm going to overrule that objection. If that's what he's testifying he knows, then that's how I'm going to take that.

Go ahead and continue, Mr. Hines.

MR. HINES: Okay.

BY MR. HINES:

Q So I notice here that the doors of the vehicle are open.

A Yes, sir.

Q Do you know why the doors are open?

A They were open when I got there, sir.
Q Okay. How many sniffs have you done on the exterior of a traffic stop?
A Roughly 250.
Q Okay. And is it common to see doors like this?
A Yes, sir.
Q Why is that common?
A It usually means the officers have asked the occupants to step out.
Q Okay. And have you shown up where the doors have been shut?
A Yes, sir.
Q What do the doors being shut indicate to you in those cases?
A That somebody had closed the doors.
Q Okay. Now, you also testify that you did a lot of traffic stops before you became a dog handler, right?
A I have, yes, sir.
Q Okay. Would you personally close the doors if the occupants had left them open?
A No.
Q Why not?
A It's not my vehicle.
Q Okay. All right. So let's continue the video.
THE COURT: Officer, can you just speak up a little

louder for me? Thank you.

THE WITNESS: Yes, Your Honor.

THE COURT: Thank you.

(Whereupon, the video was played on the record at 4:51 p.m.)

MR. HINES: I'm going to pause it again at 14:31:41.

BY MR. HINES:

Q What did we just see in here?

A Officer Gonzalez gave me a brief summary of what had transpired.

Q And is that common when you show up on a scene?

A Yes, sir.

Q Why is that common?

A The requesting officers will usually brief me as to what's going on, what they've seen, and then any indicators or anything that they picked up on during the traffic stop.

MR. HINES: Okay. Let's continue.

(Whereupon, the video was played on the record at 4:52 p.m.)

MR. HINES: I'm going to pause it again here at 14:32:22.

BY MR. HINES:

Q What's the orientation of your body camera?

A Pointed forward from nearly the middle of my plate

carrier.
Q Okay. So is it the same perspective that you would have looking down into the vehicle, or is it more of a straight view?
A More of a straight view.
Q Okay. What did you do after Agent or Officer Gonzalez spoke to you?
A Continued my pre-sniff ritual of checking the vehicle for hazards or anything dangerous that could hurt myself or my dog.
Q What type of things are you looking for?
A I'm checking to make sure there's no, like, open syringes, no -- any syringes, no blades exposed, razor blades, loose razor blades, pocket knives open, machetes, things like that that are common in vehicles that can pose a hazard or anything criminal in plain view, sir.
Q Okay. Now you said that you're worried about those things that you described as common in vehicles. Are those things you've seen in the 250 that you've ran?
A Yes, sir.
Q So the hazards that you listed, those things that you, in your own personal experience, you've come across?
A Yes, sir.
Q Okay. And then what did you do after you finished that?
A I tried to meet with the driver and occupants of the

vehicle.
Q Okay. Let's watch that.
(Whereupon, the video was played on the record at 4:54 p.m.)
MR. HINES: Okay. I'm going to pause it here at two minutes -- or sorry, 14:32:41.
BY MR. HINES:
Q What is the conversation that you're having?
A I'm trying my best to communicate with the driver and passengers, but I don't speak very good Spanish. But I'm trying to ask him if there's any narcotics in the car.
Q And does the driver of the vehicle, the person who you know is the driver of the vehicle, does that person respond to your attempts in Spanish?
A Yes, sir.
Q What does he say?
A No, sir.
Q Okay. And is that person in the courtroom today?
A Yes, sir.
Q Can you identify them by where they're sitting and an article of clothing they're wearing?
A A red shirt facing the screen.
MR. HINES: Your Honor, I ask that the record reflect that this witness identified the Defendant in this case?

THE COURT: Any objections, Ms. Bataller?

MS. BATALLER: No objection, Your Honors.

THE COURT: Okay. The record will reflect that the witness has identified the Defendant in this case.

And, Mr. Hines, a reminder, don't forget to give us a timestamp --

MR. HINES: Yes.

THE COURT: -- as you're going along. Thank you.

MR. HINES: I stopped this at 14:32:41.

THE COURT: All right. Thank you.

BY MR. HINES:

Q Okay. What is the purpose of trying to have this conversation?

A I try to have the conversation with everybody just to ask if they admit to any drug use, if they admit that they have any drugs within the car or any hazards that I need to be cautious of in the vehicle, and to explain my intent and my purpose.

Q And is this something that you do on each of your call-outs?

A Yes, sir.

MR. HINES: Let's continue.

(Whereupon, the video was played on the record at 4:56 p.m.)

MR. HINES: I've paused the video at 14:33:11.

BY MR. HINES:
Q And what's the rest of the conversation that you had there, and who were you speaking to?
A The driver I was speaking to, he had lifted his shirt, and I thought -- I saw his charm on his necklace, I thought it was a Santa Muerte.
Q Okay. And why is that significant to you?
A Santa Muerte is very common with drug traffickers as well as human traffickers, and that emblem is commonly used and associated with them.
Q Is that something you know from reading in a book, or is that something that you've experienced?
A From experience, sir.
Q Okay. And was it?
A That charm was not a Santa Muerte, no.
Q Okay. Did you speak to the other occupants of the vehicle, as well?
A Just asking if they had drugs, sir.
Q And did any of them indicate that they did or not?
A No.
Q Did the Defendant indicate whether or not he smoked marijuana?
A He said no, sir.
Q What did he tell you he smoked?
A Cigarettes.

MR. HINES: Okay. Continue the video.

(Whereupon, the video was played on the record at 4:45 p.m.)

MR. HINES: Okay. I've paused the video again at 14:33:23.

BY MR. HINES:

Q What are we looking at here?

A That's my work vehicle and my dog's kennel in the back of it, sir.

Q Okay. And is your dog in the kennel?

A Yes, sir.

Q Okay. So in your training and your experience, at what point does the sniff begin? Is it when the dog's on the vehicle? Is it when you get the dog out of the vehicle? Like when are you beginning your sniff?

A Once I've deployed her and we begin the sniff, I give the command for her to start.

Q Okay. And is that a command in English or is that in another language or what does that sound like?

A It's in English. I'll say gift.

Q The word -- what word was that?

A Gift.

Q Like I'm going to give you a gift for Christmas?

A G-I-F-T, yes, sir.

Q Okay. And what is the purpose of that word?

A That is the command for her to start sniffing.
Q Okay. And do all dogs have the same command?
A No, sir.
Q Okay. Is this the command that you and her used?
A Yes, sir.
Q How many times have you used this with her?
A Every time we've trained, every time we've deployed.
Q So we're talking in the over 500, 600, 700?
A Thousands.
Q Thousands of times?
A Yeah.
Q Okay. And is her posture something that you've learned to read once you say that?
A Yes, sir.
Q Okay. Does her posture change once you use that word? Or does she -- I guess let me say it this way. If you get her out of the vehicle and you don't use that, does she behave differently than once you say that word?
A Yes, sir.
Q How does she behave differently?
A If I don't give her that command, she's generally not going to start smelling for narcotics.
Q Okay. And what does it look like when she starts smelling for narcotics?
A She's intent. She listens to -- obeys commands and will

work around the vehicle that we approach, sir.

Q And what's the key word that starts that?

A Gift.

MR. HINES: Okay. Let's continue.

(Whereupon, the video was played on the record at 5:00 p.m.)

MR. HINES: Your Honor, I'm going to pause it here at 14:34:00.

BY MR. HINES:

Q You had said you were getting ready to begin, but then you turned and you went and did something else. What did you do?

A I went and asked for them to -- to turn the car off.

Q And why do you do that?

A It's for the safety of the dog. During the sniff, it negates the car shifting or going into gear, moving forward or moving backwards. And if the dog is deployed to the interior, it keeps the dog from accidentally bumping the vehicle into drive or neutral and causing a dangerous situation.

MR. HINES: Okay. Let's continue.

(Whereupon, the video was played on the record at 5:01 p.m.)

MR. HINES: I'm pausing it at 14:34:18.

BY MR. HINES:

Q What is it that you just said, and what is the significance of it?
A I said there's a strong wind in my face. It's significant due to when utilizing a dog, the wind plays a huge factor into where odor will or may not be due to the wind factors, the flow through whatever it is you're going to sniff.
Q Okay. And is this something that you know from your deployments, both in the military with dogs that are trained to alert to the presence of odors and in the police department, or is this something that you know solely through academic experience?
A This is through all experiences with the dog. The wind is a key factor on any sniff.
Q Okay. And I want to take a moment before we get into the rest of this video here to take a step back. And you said that Leica is trained to alert to the odors of narcotics. Is that correct?
A That's correct, sir.
Q Okay. Is Leica trained to alert to the presence of narcotics?
A The odor, sir.
Q What's the difference between the presence of narcotics and the odor of narcotics?
A The odor can be there without necessarily the presence,

sir.
Q Okay. What do you mean by that?
A Just with any other odor, it can linger after on items of clothing or seat cushions. The odor can stay without the tangible narcotics being present.
Q Okay. And how do you know what you just said to be true?
A Through life as well as training and experience.
Q Okay. Have you ever done a training exercise with Leica where you have removed a physical drug object but the odor has remained?
A Yes, sir.
Q How many times have you done that?
A It's not a regular practice.
Q Okay. But, I mean, is that something you have done once or twice or is it something that you do like once every year or two? Is that a -- I'll rephrase the question.
When you do your training drills with Leica, are you using an actual piece of narcotics?
A Yes, sir.
Q And sometimes it's what? What does that piece of narcotics look like? Is it like something in a bag or is it something that's loose laying on the ground? Like how does it generally look when you're using it for training purposes?
A They'll be contained and maintained by the trainer and

they'll generally be in some sort of a container, either a K-9 specific training bag or they can also utilize like cotton balls that have sat in with the tangible narcotics and then are putting off the odor.

Q Okay. So to train with the presence of the odor, they would then use like what you just said was a cotton ball?

A Yes, sir. Common practice.

Q Okay. And that leaves enough smell remaining to where the dog would be able to do what?

A To be able to alert.

Q Okay. And in Leica's case, what type of alert would it be?

A A passive alert, sir.

Q And have you done this drill with Leica?

A Yes, sir.

Q And has she given you passive alerts in the past to the odor where there's no actual narcotics present?

A Yes, sir.

Q Where you knew that odor existed because you had seen the narcotics be next to the object that was giving off the odor?

A Yes, sir.

Q Okay.

THE COURT: Mr. Hines, it's 5:03. Tell me, how much longer do you think you'll be with the --

MR. HINES: He's about to be finished with the run and I'm going to let him go. I think I've established a sufficient predicate, Your Honor. So I would say probably within the next 10 minutes.

THE COURT: Ms. Bataller, how long do you think you'll be at? I don't want to cut you off.

MS. BATALLER: I think I'll be very brief. I think 20 minutes at the most. I can't imagine spending longer than that, Your Honor.

THE COURT: All right.

MS. BATALLER: I'll (indiscernible).

THE COURT: Okay. All right. Go ahead --

MR. HINES: And I had to build up to this point, Your Honor, and I think we're going to start to move a lot quicker as we go downhill here.

THE COURT: All right. Go ahead.

MR. HINES: Thank you, Your Honor.

All right. Let's continue.

(Whereupon, the video was played on the record at 5:06 p.m.)

MR. HINES: Again, I paused it real quick here at 14:34:25.

BY MR. HINES:

Q What did we just hear?

A My command of gift.

Q And what does that begin?
A Her sniff.
Q Okay. And how did you see her respond to that?
A She starts -- she obeyed the command and starts sniffing, actively sniffing the vehicle.
Q Okay. And what direction was she headed when you gave her the command?
A Towards the vehicle.
Q Okay. Did she change directions when you gave her the command?
A With me, yes.

(Whereupon, the video was played on the record at 5:06 p.m.)

MR. HINES: Okay. I paused the video again at 14:34:35.

BY MR. HINES:
Q What did we just see?
A Leica's passive alert.
Q Okay. That was it?
A Yes, sir. She -- she pulled -- she pulled her -- from -- she moved her head hard from right to left, broke from the pattern, search pattern.
Q What was the search pattern that you had begun there?
A Counterclockwise, sir.
Q Counterclockwise from what position?

A From the rear to the front on the passenger side. She started inhaling deeply with her nostrils while moving back down the passenger side of the vehicle.
Q Okay. Now, if she hadn't have given you the alert, what direction would she have continued to travel or would you have continued to travel?
A Around counterclockwise, sir.
Q So that would have been towards the front of the vehicle?
A Yes, sir.
Q Okay. I will run it back. And again, I'm at 14:34:35. I'm going to run it back just very briefly. And I want to see that again. And then I'm going to ask you to, now that we know what we're looking for, I want you to show it specifically to me while it's happening.

(Whereupon, the video was played on the record at 5:08 p.m.)

THE WITNESS: Okay. So we start counterclockwise.

MR. HINES: I'm going to mute the volume, Your Honor, if that's okay.

THE COURT: That's fine.

MR. HINES: And then allow him to narrate contemporaneously.

THE WITNESS: We're working counterclockwise around the vehicle. She gets to the front passenger area here. She

immediately cuts back hard to her left, the opposite way of her search pattern we were working. She's now air-scenting, trying to get back into the scent cone.

MR. HINES: Okay. I have stopped at 14:34:40.

BY MR. HINES:

Q You said she's now air-scenting. Is that when she leaves the back of the vehicle and goes towards another vehicle?

A Yes, sir.

Q What does that mean?

A She hops onto her hindquarters, the front paws up in the air, trying to get back into the odor that she had initially drawn her that direction, with that wind coming in our face.

Q Okay. And that's the same direction that you called out as you and her approached the vehicle?

A Yes, sir.

Q The wind?

A Yes, sir.

Q Okay. Now what do we see?

A Getting back on pattern and continuing our sniff, continuing to sniff around the vehicle. This is the initial pass, a free pass. I'm not giving any hand presentations, just allowing her to work. Now I'll start with hand presentations.

Q I'm going to pause it for a second. What's the purpose

of a hand presentation?
A It's to ensure the dog is sniffing different locations on the vehicle to ensure the entirety of the vehicle is sniffed.
Q Again, she gave a passive alert before you pointed any area out.
A Yes, sir.
Q Does she give you a second alert --
A Not there.
Q -- at any point? Or another passive alert?
A Yes.
Q Has that already occurred or is that about to occur?
A It hasn't.
Q Will you point it out for the Court when it happens?
A Yes, sir.
There, she wants to get into the vehicle as opposed to following the hand presentation towards the seat.
Q Okay. Now I've stopped the recording at 14:35:29. How is that another alert?
A She's actively trying to get into the vehicle to get to what she smells, sir.
Q Okay. Now, have you ran her in vehicles where there have not been narcotics present or the odor of narcotics, more correctly?
A Yes, sir.

Q Does she do what we just saw?
A No, sir.
Q I mean, I have a German Shepherd mix and my dog jumps up like that all the time. That's not common for Leica to do?
A Not during a sniff, no, sir.
Q Okay. She wouldn't have gone in there unless it had been an alert?
A Correct, sir.
MR. HINES: Continue the video.
(Whereupon, the video was played on the record at 5:11 p.m.)
BY MR. HINES:
Q Are there any other passive alerts?
A She attempts again in this back rear area to try to jump again in order to get into the vehicle.
Q What are you doing here?
A Hand presentation's high.
Q Okay. Now her getting up in the -- I've paused the video now at 14:35:48. Her getting up in the window, is that common?
A Following the hand presentation, yes, sir.
MR. HINES: Okay. Let's continue.
(Whereupon, the video was played on the record at 5:12 p.m.)
BY MR. HINES:

Q And why are you putting your hand in the window like that?
A To get her to hop to sniff.
Q Okay. Now you've opened the door here, correct?
A Yes, sir.
Q Why did you open the door?
A Because she had alerted, and I'm going to have her enter the vehicle for an interior sniff.
Q Okay. And how do you know she alerted at this location?
A Because that's where the initial alert was, sir.
Q Okay. And I have marked this, and I've stopped it at 14:36:02.
Okay. What do we see when she enters the vehicle here?
A She's actually not going to get into the vehicle.
Q Why not?
A Because she indicates.
Q What is an indication?
A A trained response to the source of odor.
Q And is that different than an alert?
A Yes, sir.
Q What happens in an indication?
A That's her indicating where she smells the strongest concentration of a trained odor.
Q And what does that look like?
A She will stop and stare or sit.

A Okay. And what does she do in this instance?
A She stops and stares.
Q Okay. And are all dogs, odor dogs, trained to that, or do different dogs have different -- what's the correct term for this you just used?
A Indication.
Q Indication. Do all dogs have that type of indication?
A That dog dependent.
Q Okay. How do you know what Leica's indications are?
A She's my dog, sir.
Q And have you seen her do it before?
A Yes, sir.
Q Have you done it in training with her?
A Yes, sir.
Q And was that part of your certification process?
A Yes, sir.
Q Can you point out in the video here as we begin to press play where the indication is?
A Sure.
THE COURT: Agent, you'll need to speak up, okay?
THE WITNESS: She's there pointing with her nose towards the back.
BY MR. HINES:
Q Okay. And that was at -- let me run it back just a second so I can stop it and mark it, what you call the

indication. Sorry, I went too far.

Okay. Tell me when to pause when you see the indication.

A There.

Q And that was the moment right before this where her head turned?

A And then stops and stares.

Q Okay. And that's at 14:36:04, or 05, in that vicinity.

Q Okay. What do you do after you see this?

A I take her back to the vehicle, put her in her kennel, and get gloves to begin a search of the vehicle.

Q Why do you do that?

A Because she alerted to the vehicle.

Q So what are you going to do?

A Search the vehicle.

Q Based off of her alert, what do you believe is in the vehicle?

A Narcotics, sir.

Q What type of narcotics?

A Either -- illegal narcotics, either marijuana, heroin, cocaine, methamphetamine, or MDMA.

Q And how do you know that there's an odor of that in the vehicle?

A Due to her alert.

MR. HINES: Can you play the video?

(Whereupon, the video was played on the record at 5:15 p.m.)

BY MR. HINES:

Q You said you've been an agent for how long?

A An officer for nearly seven years, sir.

Q I apologize, officer, yes. And how many narcotics cases have you worked?

A A few hundred, sir.

Q Okay. And have you worked cases where narcotics have been hidden in vehicles?

A Yes, sir.

Q How are narcotics often packaged?

A Depends, sir.

Q Depends on what?

A On the type of narcotic, the size of the narcotic, the quantity.

Q Okay. And what is the variation in size you have personally seen in narcotics?

A From tiny to large, sir.

Q Okay. When you say tiny, what does tiny mean?

A Single pills or small amounts of powder.

MS. BATALLER: Your Honor, I'm just going to object to the relevance of this line of questioning, considering that they never recovered drugs from this vehicle. I'm not sure what it has to do with this --

MR. HINES: Your Honor, I'm establishing that he has training and experience and knowledge that would allow him to search in places where things as small as a pill could be hidden. And while in the course of that lawful search, he's going to discover the weapon. And there will also be here in a moment that you'll see where he finds rolling papers, which is what the dog alerted to with the odor of narcotics.

THE COURT: Okay. Objection overruled.

Go ahead.

BY MR. HINES:

Q What is that you just pulled out?

A Open beer.

Q I'm going to pause it right here at 14:37:28. What's in your hand?

A Raw brand rolling papers.

Q How do you know that those are rolling papers?

A I've seen them before.

Q How many times have you seen them before?

A Numerous, sir.

Q And where have you seen them used or where have you seen them? Like in the store or --

A In vehicles, in the store, and in other searches.

Q Okay. And have you personally seen them with narcotics?

A Yes, sir.

Q How do you know that this is an indicator of narcotics?
A They're commonly associated with marijuana and often found together.
Q Okay. Why are they often found together?
A Because it's a means to ingest marijuana.
Q How is it a means to ingest marijuana?
A They're utilized to roll marijuana cigarettes and then smoked.
Q Okay. And you know that through training or you've seen that or how do you know?
A Through experience from training as well as experience, sir.
Q Okay. And what does the presence of this indicate to you, coupled with the dog alert?
A That there's narcotics.
Q And so what do you do --
A The odor of narcotics.
Q What do you do then in response to that?
A I continue to search, sir.
Q And what are you going to search?
A Everything in the vehicle, the entirety of the vehicle.
Q Okay. What is that that we see? That you just put in the packet?
A Like a little dowel. It was right there with it.
Q Does that have any significance to you?

A Not that I know of.
Q What did you just pull out of that duffel bag?
A An AR style magazine with ammunition.
Q And it was loaded?
A Yes, sir.
Q Okay. What did you just do here? I paused the video at 14:37:53. What are you pointing at? What are you doing?
A I'm reaching back into the vehicle. I'm not sure what I'm reaching for at this --
Q Okay. If I turn the sound back on and run it back, would that help you refresh memory?
A Yes, sir.
(Whereupon, the video was played on the record at 5:19 p.m.)
BY MR. HINES:
Q Okay. Now that you've listened to the audio, I've again paused it at nearly the same spot, 14:37:50. What did you say and what are you doing?
A I had let Officer Matthews know that I found the magazine and I told him to be cautious. And then I hadn't seen the rifle. And then as I look back in, I see a part of the rifle sticking out from underneath some clothing.
Q Okay. And why are you securing it?
A Because I don't want it to be used against me.
(Whereupon, the video was played on the record at 5:20

p.m.)

MR. HINES: Okay. I'm going to pause it here at 14:38:10.

BY MR. HINES:

Q What did you just say?

A Go with her. Code 10.

Q Who is "her" and what does Code 10 mean?

A I was referring to Officer Gonzalez's partner and Code 10 is to use extra caution. Use caution.

Q Why extra caution?

A Well, I just discovered the firearm in the vehicle and they need to know to be safe and to double check to make sure they haven't missed one that somebody might have concealed on that person.

Q Missed one what?

A A firearm.

Q Okay.

(Whereupon, the video was played on the record at 5:21 p.m.)

BY MR. HINES:

Q Okay, Officer, and then this is your body camera video, correct?

A Yes, sir.

Q And this video lasts for another, it's an hour and eight minutes and five seconds long. And it goes all the way until

you're back in your vehicle at 15:38:58. What did the rest of your search entail?

A I searched the entirety of the vehicle from the front to the rear, all of it.

Q Okay. And did you locate narcotics?

A I did not, sir.

Q Did you locate an object that you believe had the presence or odor of narcotics on it?

A Yes, sir.

Q What was that object?

A The rolling papers, sir.

Q Okay. And why do you believe that?

A Because they're commonly associated together. It's drug paraphernalia.

Q Okay.

MR. HINES: Pass the witness, Your Honor.

THE COURT: All right. Ms. Bataller.

MS. BATALLER: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. BATALLER:

Q Good afternoon.

A Good afternoon.

Q Coming on evening. So just to be very clear, this Leica is only trained to detect drugs, correct?

A Yes, ma'am.

Q Not guns?
A No, ma'am.
Q Not undocumented people?
A No, ma'am.
Q Just drugs. And as you testify, you didn't find any drugs whatsoever in the vehicle?
A That's correct, ma'am.
Q You found rolling papers, correct?
A Yes, ma'am.
Q But people also use those for cigarettes, correct?
A They may, yes.
Q So they're commonly used for cigarettes, correct?
A I don't know anybody that uses them for that, ma'am.
Q But you do know that they can be used for that, correct?
A Sure.
Q And Mr. Rios --
THE COURT: Agent -- I mean, Officer, can you speak up please for me? Thank you.
THE WITNESS: Yes, ma'am.
BY MS. BATALLER:
Q And Mr. Santana Rios had told you that he smoked cigarettes, correct?
A Yes, ma'am.
Q And you had heard that the back passenger was smoking a cigarette as well, correct?

A I had heard that somebody was smoking a cigarette, yes, ma'am.
Q Okay. So you know there's smokers in the vehicle, correct?
A Yes, ma'am.
Q And you didn't test anything in the vehicle for marijuana, correct?
A Tested.
Q Did you test the rolling papers to see if they had marijuana on them?
A No, ma'am.
Q You didn't recover them either, did you?
A I left them with the handling officers, ma'am.
Q Okay. So they're not held for evidence, correct?
A I don't know, ma'am.
Q And as far as you know, they didn't test it at all, correct?
A Correct.
Q Now, passive alerting is basically the same as casting, correct?
A I'm not familiar with that term.
Q Okay. It's different -- you testified it's different than active, correct?
A Yes.
Q Now, when you're in the military and you're looking for

explosive devices, those cases don't typically go to trial, correct?

A No, ma'am.

Q You just need to --

THE COURT: Okay, excuse me.

Myrna, can you hear the officer?

THE CLERK: Yes.

THE COURT: You can? Okay.

All right. Continue.

BY MS. BATALLER:

Q You just need to know whether there's explosives for your personal safety, correct? And your other people in the military's safety as well, correct?

A Soldiers?

Q Soldiers.

A Yes, ma'am.

Q Thank you for that word. It's getting late.

Soldiers, for their safety as well, correct?

A And the population as well, yes, ma'am.

Q Right. For this kind of a case, what you use Leica for, you know that these cases often go to suppression hearings like this, correct?

A Yes.

Q Or trials, correct?

A Correct.

Q So it would make sense in military settings to just have a passive alert, right? But in this kind of alert, in this kind of case, it's -- let me actually change my mode of questioning. It's possible to train dogs to sit when they smell the odor of drugs, correct?
A Yes.
Q Or do something active?
A Yes.
Q And that would be something that a judge could tell that dog is alerting, correct?
A Potentially, yes.
Q It's harder when it's just a passive alert to be able to discern, for anyone but you to be able to discern whether that dog is alerting, correct?
A Yes.
Q But you said that Leica was not trained to actively alert. She was only trained to passively alert?
A Passive alert, yes, ma'am.
Q And that's something that is different every time you testified, right?
A They can look at it different, yes, ma'am.
Q And only you are able to tell the Court when the dog alerts, correct?
A Yes, ma'am.
Q No one else could come in and watch that video and say

that's where the dog alerted, correct?

A That I don't know.

Q Now, I want to go to -- I'm looking at your body cam video. So I'm going to go to when the dog starts going around the vehicle.

MS. BATALLER: I'm just trying to look at the -- is it okay that I use? Okay, let's start here. We're starting at 14:33:44.

(Whereupon, the video was played on the record at 5:27 p.m.)

MS. BATALLER: I'm going to pause it here at 14:34:31.

BY MS. BATALLER:

Q You said that the dog passively alerted here. Can you point to what specifically you see him doing and that we can see him doing in this video?

A Yes, ma'am. We're working a search pattern counterclockwise from the rear to the front. And as I try to continue that, she cuts to the back, breaking the search pattern against the way we had been searching and continues to sniff the seam of that vehicle on the passenger side.

Q Now, you never found any marijuana in the seam of that vehicle, correct?

A No, ma'am.

Q And you never tested that area of the vehicle for

marijuana, correct?
A No, ma'am.
Q Or any other drug, for that matter?
A No, ma'am.
Q And when you actually were going into the vehicle, you didn't smell any marijuana either, right?
A I didn't, no, ma'am.
MS. BATALLER: Okay. Let's continue.
(Whereupon, the video was played on the record at 5:28 p.m.)
BY MS. BATALLER:
Q And now she goes around the vehicle another -- I'm stopping at 14:35:17. She goes around the vehicle another time and doesn't passively alert, correct?
A I would have to watch. I don't recall.
Q What you just saw, did you see her passively alert?
A Just when I voiced it to you.
Q Okay. So I'm going to start playing it again.
(Whereupon, the video was played on the record at 5:29 p.m.)
BY MS. BATALLER:
Q At that point, you give her a hand signal, did you call it?
A Command.
Q Hand command, correct?

A Or presentation.

Q And that makes the dog go where you put your hand, correct?

A No.

Q What does a hand presentation do?

A It's an attempt to get the dog to sniff a certain location.

Q The location where you're putting your hand, correct?

A Yes.

Q So they're going to go towards that location, correct?

A Yes.

(Whereupon, the video was played on the record at 5:30 p.m.)

THE COURT: Wait, hold on.

MS. BATALLER: Starting it again.

THE COURT: Stop, Ms. Bataller. We need to get an answer.

MS. BATALLER: Oh, I'm sorry. Did I miss something?

THE COURT: I didn't get an answer for the question that you asked officer. If you can re-ask your last question.

MS. BATALLER: It's getting late and I totally forgot.

THE COURT: Okay.

MS. BATALLER: I don't know if anyone else -- what was the question I asked him?

BY MS. BATALLER:

Q Oh, the hand gesture or you said the hand -- what's the word that you used? I'm sorry, I'm forgetting.

A Presentation.

Q Presentation. So the dog will go where you -- towards where you put your hand, correct?

A Correct.

Q Because you're telling them to sniff there, correct?

A Correct.

THE COURT: All right.

MS. BATALLER: Sorry. And we'll restart again.

(Whereupon, the video was played on the record at 5:31 p.m.)

MS. BATALLER: Now, I'm stopping at 14:36:05.

BY MS. BATALLER:

Q This is where you say she passively alerts again.

A Correct.

Q And you testified that it's because she's pointing towards it.

A Correct.

Q But when she goes in to sniff the car, her nose is always pointing towards the car, correct?

A She stops and stares, Miss.

Q Okay. I'm going to go back just a little bit.

Actually, I'm going to continue it forward from this point, 14:36:05, and let's see if we can see her stop and stare.

(Whereupon, the video was played on the record at 5:32 p.m.)

BY MS. BATALLER:

Q Did you see her stop and stare there? I'm stopping at 14:36:08.

A Yes, ma'am.

Q You saw her stop and stare --

A Yes, ma'am.

Q -- between 14:36:05 and 14:36:08?

A Yes, ma'am.

Q Okay. I'm going to go back.

(Whereupon, the video was played on the record at 5:32 p.m.)

BY MS. BATALLER:

Q Let's see. So it's your testimony that she stopped and stared in that period of time?

A Yes, ma'am.

Q Okay.

A And that's why I give the marker of good.

THE COURT: I'm sorry. What was you gave a marker what?

THE WITNESS: Good, the command.

THE COURT: Oh, okay.

THE WITNESS: Voiced it to her.

THE COURT: All right.

MS. BATALLER: And just one more. I think I just have one question more, Your Honor, and then I'm done.

BY MS. BATALLER:

Q And when you searched this car, you searched it thoroughly, correct?

A Yes, ma'am.

Q You were looking even into the battery in the vehicle?

A The second battery in the back, yes, ma'am.

Q And under the hood?

A Yes, ma'am.

Q And you found absolutely no narcotics whatsoever, correct?

A Correct.

MS. BATALLER: Nothing further.

THE COURT: All right. Mr. Hines, any other questions?

MR. HINES: No, Your Honor.

THE COURT: May Officer McKenzie be excused, Mr. Hines?

MR. HINES: Yes, Your Honor.

THE COURT: And Ms. Bataller?

MS. BATALLER: No objection, Your Honor.

THE COURT: All right. And just one clarification for me, Officer McKenzie. So Leica was not trained to sniff weapons, is that right?

THE WITNESS: That is correct, ma'am.

THE COURT: Just drugs?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Thank you very much for coming down. Officer McKenzie, you may be excused.

THE WITNESS: Thank you, Your Honor.

THE COURT: Thank you.

(Whereupon, the witness was excused.)

THE COURT: All right. So with that, I know it's been a long afternoon. Mr. Hines, do you have any other witnesses or evidence?

MR. HINES: No, Your Honor. All right.

THE COURT: And Ms. Bataller, any witnesses or evidence?

MS. BATALLER: No witnesses or evidence. Just argument and (indiscernible).

THE COURT: Yes. All right. So I'm going to hear arguments, and since it's Ms. Bataller's motion, the Defense motion, go ahead at the podium, Ms. Bataller.

MS. BATALLER: Thank you, Your Honor.

As the Court noted at the beginning, it is the

Government's burden to show the legality of a Fourth Amendment intrusion when there's no warrant, and they have far from done so here. A traffic stop is obviously analyzed the same way as a Terry stop. Step number one, was the stop justified at its inception and, step number two --

THE INTERPRETER: Your Honor?

MS. BATALLER: -- did the officer's actions --

THE COURT: Hold on. Hold on, Ms. Bataller.

THE INTERPRETER: I'm so sorry, Your Honor. But you have to slow down for (indiscernible).

MS. BATALLER: Oh, I --

THE INTERPRETER: It's late and we've been -- yeah.

MS. BATALLER: Absolutely, understood. I apologize.

THE COURT: All right, thank you.

MS. BATALLER: And number two is, were the officer's actions reasonably related to the circumstances that justified the stop? Because this is the standard, prolonging a stop, a traffic stop for a dog sniff, without reasonable suspicion, is a violation of the Fourth Amendment under Rodriguez v. United States. That's 575 U.S. 348, and it's a 2015 Supreme Court case. The stop here was prolonged about seven minutes from the time that she called the drug dog, and that's the same amount of time that they waited in Rodriguez.

But Rodriguez makes clear that any amount of time beyond the purposes of a traffic stop is too much for the Fourth Amendment. It's a violation. While we agree that the stop was justified at its inception, he was stopped for a traffic infraction, the officer's actions went well beyond the scope of the information that she had. The officer's responsibility during a traffic stop is to run the person's license, check registration, and then resolve the stop in some way with either a ticket or a warrant -- or not a warrant, I apologize, a ticket or a warning.

And here, this officer, Officer Gonzalez, called almost immediately for a dog. It was after she stopped the car, got their information, and said, call the dog. She had no information that anything other than a traffic infraction had occurred. The information that she gave the Court, she never mentioned once throughout the body cam video, she never said anything about it to anyone on the scene. And her actions show that that is an after-the-fact justification for her prolonging the stop to bring a K-9 around the vehicle when she did not have reasonable suspicion.

As you could see from the video, Mr. Santana Rios and the passengers were very even-keeled. They were not nervous or erratic or acting strangely in any way. Once the officers started speaking in Spanish, they followed all commands. They had to wait various minutes in the sun for

this dog to arrive, and no new information came about to suggest they were committing any sort of crime. I know Officer Gonzalez said she was worried about her safety at one point, but she never saw any weapon. No one ever reached for a weapon. No one had anything on their person, and no one was acting violent in any way.

There was no inconsistent stories from the passengers, nothing to suggest that anything was going on here other than him committing a traffic infraction. I think she mentioned having luggage that she didn't know what the luggage was in the vehicle for. Officer Gonzalez mentioned that that is completely normal when you're leaving a hotel, and there's evidence that Mr. Santana Rios was leaving the hotel.

She said that she never saw anything like people passing money or exchanging drugs or anything of that sort. Her only evidence was that, according to her, this is a high-crime area, and that someone was smoking a cigarette in the vehicle with the window rolled up. This is also a neighborhood where there are federal buildings, like a Social Security agency. There was testimony that this is -- people regularly -- there's a doctor's office there, and this was the middle of the day. Smoking a cigarette is unfortunately very common. People smoke all the time, and there's nothing about that that would suggest there was a drug crime. And

again, she didn't mention anything about believing there was a drug crime occurring to anyone.

As far as the evidence that she was very concerned that there was smuggling going on, her actions just defy that that was her actual motivation in this case. She, instead of asking, wait a second, what are these documents, are you going to immigration court, do you have permission to be here, she just takes their documents, waits for the drug dog, and then after the drug dog is already there, runs their information to see if they're here legally. She doesn't give you anything to suggest these are actually falsified, and it's her burden to show that there's reasonable suspicion for the stop. You can't just say, well, I don't know that they're not valid.

And with all due respect to the officer, the normal thing to do from what I've seen from my experience in this job is people call Border Patrol, and Border Patrol was not called until after the dog was already sniffing the vehicle. Obviously, the K-9 cannot detect someone's immigration status, and only Border Patrol would be able to help with that. There's no evidence that later they spoke with this female Venezuelan about whether she was the victim of trafficking. There's no evidence that that's the case. And there's no evidence to support that alleged suspicion, which, like I said, came up after the fact that this case was going

to a suppression hearing, not at any point during the stop.

Just very briefly to go into this, I don't think this should be an argument, but I know the Government wrote this in their response. Just because you can arrest someone for a traffic infraction, you still have to go through a Terry analysis. It's very clear under Rodriguez. The dissent argued against that, but clearly by being in the dissent, that was explicitly rejected.

Furthermore, cases like United States v. Pack, which is a binding Fifth Circuit case law, talk about the fact that the person could have been arrested for the traffic violation in that case. And in fact, they still said you have to do a Terry analysis. The Fourth Amendment still applies. And even if that were the case, they still wouldn't have a reason to search the car afterwards because they weren't even physically close to the vehicle and couldn't have grabbed anything out of there.

Under Arizona v. Gant, if you're going to search a vehicle incident to arrest, it has to be within the person's physical control what you can actually search, and that vehicle clearly was not. They were on the other side of the parking lot.

So it's abundantly clear that the Government failed the first step, and I think it's important to note that this case is disturbingly similar to the Melendez case, where

Judge Guaderrama I think rightfully found that her reasons that she gave for reasonable suspicion just weren't reasonable. I think the same thing is the case here. But that's not the only problem with their case. There's also a problem with the dog sniff. Under United States v. Clayton, that's 374 F.App'x 497 (5th Cir. 2024), you have to be able to articulate actual facts that show the dog alerted.

And I think even more importantly is United States v. Rivas, 157 F.3d 364, says that the Court should be especially skeptical of something called casting, which to me is the same as a passive alert. A passive alert is basically a way for officers to say, I know it when I see it, and only I know it. And that's what happened here. What the officer testified to was not visible from the video. There are not actual things he can point to that we saw in the video that show that this dog alerted.

And I think even more problematic is the fact that they didn't recover any drugs whatsoever. They didn't say anything about the rolling paper having some sort of residue on it or anything like that. There's nothing suggesting there were any drugs in his car. And we know for a fact there's two smokers in the car, and you can use rolling papers for cigarettes.

And even more problematically, and this is the last thing I wanted to mention, Your Honor, is they never tested

the papers or what they thought was the reason for the alert. Like I said, this is strikingly similar to the Melendez case, except that in the Melendez case, the officer testified that she had reasonable suspicion based on there being marijuana residue. There is nothing here. And what she brings up about human smuggling and drug trafficking being her spidey sense, I think that's what it was. It seems more like a fishing expedition than actual reasonable, articulable facts that a crime was being committed.

And so for those reasons, we do believe that this is a case where you should absolutely suppress the evidence. Thank you.

THE COURT: Thank you. Mr. Hines?

MR. HINES: Thank you, Your Honor.

I agree with Defense that if this was just a traffic stop, we'd be in a big world of hurt. I think if you look at the Fourth Amendment case law, it's pretty clear. And, Judge, I also would point you to Judge Guaderrama's decision, not only for the reasons we talked about at the bench, but he does a good job of laying out case law, does a good job of laying out the state of dog sniffs, and I want to distinguish some of the facts there versus the facts here.

The first thing I want to talk about is the length of the stop. I think that's the crux of basically the Defendant's argument. It's also the crux of the legality of

what's happened here. This officer testified that she pulled over for a traffic violation. She thought a different crime was occurring, but then she didn't begin to suspect or investigate that second crime until she began to see the indications of alien smuggling. And you saw those indications on video, and she described to you contemporaneously her present sense impressions of that.

If you look at the timeline on this, it is a pretty -- there is no per-se rule, but just to recap the timeline for the Court's position. At 14:25, you have the first siren. By 14:34, the dog alerts. The gun is found at 14:38. And at 14:40, she's doing radio checks to determine whether or not an alien smuggling event is going on or that people have documents that would allow them to reside or be in the United States.

THE COURT: What was that last time?

MR. HINES: 14:40 --

THE COURT: 14:40.

MR. HINES: -- is when she's doing the radio checks.

THE COURT: Okay, thank you.

MR. HINES: So there's three crimes that have occurred. There's a traffic code violation, which the Defendant is ultimately arrested on under Texas law. That's an unlawful arrest. I apologize. There's not three crimes

that occurred. There's three investigations that are occurring. Technically four, but we don't get into the fourth here today. Those are four investigations. First, the traffic offense, which case law is clear once that is done under Powell -- which is Tab G in the supplemental law that I've given you, Your Honor -- that in the context of a traffic stop, once an officer's initial suspicions of a traffic violation have been verified or dispelled, which would be the moment where he says, yes, my traffic light is out, the detention must end unless there's additional reasonable suspicion supported by articulable facts. Okay?

So if we go straight off of the rule of Powell and off of Defense Counsel's reasonings, the traffic stop has to end after she writes him a ticket when he says, yes, I know my taillight's out. And she's got to go back to her car, write a ticket, and then the dog can only be ran and the time it would take her to write the ticket for the offense that the Defendant admitted he committed, which was the failure to turn because he knew his traffic light was out.

However, she has testified to those articulable facts to you, Your Honor. She told you that she didn't know the names of some of the -- or she couldn't determine whether there was positive information on the people in the back of the vehicle. She couldn't determine whether or not it was a valid notice to appear. She couldn't determine based off of

the item that was on the phone whether that was also a valid document. She tried to run those documents, and she ended up having to call on the radio, channel one, to verify the information that was handed to her. And by the time that she had verified the radio at 14:40, the gun had already found and the dog had already alerted.

Based off of that, I think if you also look at Powell, that it's clear that reasonable suspicion of other crimes can provide an independent basis for prolonging the investigatory detention beyond the parameters of a run-of-the-mill traffic stop. And that's United States v. Powell, 732 F.3d 361,371 (5th Cir. 2013).

As to the dog alert, Your Honor, the handler provided in-depth, and perhaps to my detriment, too much information for the Court about his training, his experience, how he knows the dog alerts, what the dog's been trained to, what he's seen the dog do. And when Defense Counsel tried to tag him with casting, as it's called in Rivas, he didn't know what that was, he didn't understand that, and he was able to show you on the video, this is where she changed direction, this was the alert. She showed you a second alert, and then he also showed you where the K-9's head was a stop and stare.

So we believe all of that's correct, and I think if you look at United States v. Lopez, which Judge Guaderrama also references in his opinion that Defense has brought up

and mentioned, that he, in United States v. Lopez, which is a Northern Texas -- Northern District of Texas decision, it says that a K-9 alerting behavior is particular to the dog because each dog alerts in a different way. The dog's behavior must be interpreted by the handler.

And I want to take a moment and distinguish this case, because Defense has made a big deal about how this case is so similar to Melendez. Where this case is different, Your Honor, I think in Melendez, the dog handler did not say to Judge Guaderrama, look, here's exactly where the alert occurred, that dog and I have done thousands of trainings together, I know this is the moment, here it is, you see it right there, the way that you got told today. That's one of the areas.

And second, here, there's also the added information of the alien smuggling event ongoing and having to check those individuals' background information and those individuals' statuses and whether or not there were open warrants on them and confirm whether or not they had actual documentation that would allow them to be in the United States. Melendez was a U.S. citizen and that was not a part of what they were having to do at that point.

Based off of those reasons, Your Honor, we believe that Defense's motion should be overruled and that none of the evidence should be suppressed and any further admissions

or seizures of evidence or admissions by the Defendant be found admissible and available to the United States at trial.

THE COURT: Ms. Bataller, anything else?

MS. BATALLER: I would just note one last thing, Your Honor. The United States v. Rodriguez is a Supreme Court case and it's from 2015 after Powell. And so I would look to that for the argument on reasonable suspicion being able to prolong of the stop.

THE COURT: All right, thank you.

All right, so this is what -- I'm going to give the parties a little bit of homework. I'm going to ask both parties to provide the Court, my Court, with a joint stipulation of facts. There are a great many facts here, all the details of the times and et cetera. So I want a joint stipulation of facts filed with the Court by December 9th.

If you can't agree with certain facts, I'm going to ask each party by that deadline as well to specify what you can't agree to. Please include any relevant case law citations as well as the timestamps in the record. So again, a joint stipulation of facts. If there are certain things that you can't agree to, please file that separately specifying those items with case law and timestamps from the record or from today's testimony.

If for some reason you can't get the transcript and you can't -- by then in time for that deadline, December 9th,

I'm going to ask the parties to please file a joint motion for continuance and I'll extend that deadline. I know that the jury trial is set for February the 18th. Of course we need to, since this is an R&R, Report and Recommendation, I'll need to have time to be able to file that and allow the parties to file objections to that R&R.

THE COURT: So with that, anything else in this case at this time, Mr. Hines?

MR. HINES: Nothing further on behalf of the United States. Thank you, Your Honor.

THE COURT: And Ms. Bataller?

MS. BATALLER: No, Your Honor. Thank you.

THE COURT: All right, thank you all very much. We'll be recess in this case, and all of you may be excused.

COURTROOM DEPUTY: All rise.

(Whereupon, at 5:53 p.m., the hearing was adjourned.)

* * * * *

C E R T I F I C A T I O N

I, DIPTI PATEL, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

___________________________

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

LIBERTY TRANSCRIPTS DATE: December 1, 2024